**In re Delbert SNYDER and Deanna J. Snyder, Debtors.**

**In re Robert SNYDER, Debtor.**

**Bankruptcy Nos. 88–81234, 88–81235.**

United States Bankruptcy Court, C.D. Illinois.

April 28, 1989.

Gregg N. Grimsley, Peoria, Ill., for debtors.

Douglas R. Lindstrom, Galesburg, Ill., for Farm Credit Bank of St. Louis.

OPINION

WILLIAM V. ALTENBERGER, Bankruptcy Judge.

Delbert Snyder (DELBERT) and Robert Snyder (ROBERT) are brothers who jointly own and operate a farm in Central Illinois. Each filed a separate Chapter 11 proceedings.[1] DELBERT's schedules show secured debts totaling $1,903,622.00, unsecured debt of $23,754.00, and property totaling $687,896.00, of which $581,000.00 is attributable to real estate. ROBERT's schedules show secured debt of $1,891,-622.00, unsecured debt of $21,608.00, and property totaling $659,047.00, of which $569,700.00 is attributable to real estate. Included in these figures is jointly owed debt of $126,794.00 to their father, secured by farm vehicles valued at $20,000.00 and $1,481,635.00 due the Farm Credit Bank of St. Louis (BANK), secured by their jointly owned farmland which they valued at

---

1. Included in DELBERT's was his wife, Deanna J.

$581,104.00. Their plans of reorganization provide that they will retain the jointly owned farmland, write down the BANK's secured debt to the value of the farmland, pay unsecured creditors 10%, and that their father will release his claims.

The BANK filed an objection to both disclosure statements and filed motions to dismiss the Chapter 11 proceedings. The basis for the objections and the motions to dismiss are the same. The BANK contends the plans fail to meet the requirements of the absolute priority rule found in 11 U.S.C. Section 1129(b)(2)(B)(ii), in that unsecured creditors would only be receiving 10% while the debtors retain their farm. The debtors respond by contending they come within the "fresh capital" exception to the absolute priority rule by making a fresh capital contribution of $30,000.00 through their father's release of his secured claim valued at $20,000.00 and his unsecured claim of approximately $100,000.00, which equates to a $10,000.00 saving under the plan. The BANK counters by arguing the fresh capital exception was eliminated with the adoption of the Bankruptcy Code. There are two issues before the Court. First, whether the fresh capital exception to the absolute priority rule is still viable under the Bankruptcy Code; and second, if so, does the father's release of his claims constitute a contribution of fresh capital.

■ Neither the BANK nor the debtors presented any authority on the issue of whether the fresh capital exception to the absolute priority rule is still viable. The BANK cites *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 108 S.Ct. 963, 99 L.Ed.2d 169 (1988), and *In the Matter of Stegall*, 865 F.2d 140 (7th Cir.1989). These cases raise the issue, but do not decide it. In *Norwest Bank Worthington v. Ahlers, supra*, the United States, as *Amicus Curiae*, urged the Supreme Court to hold that the codification of the absolute priority rule in the Bankruptcy Code eliminated the exception. The Supreme Court declined, and in deciding the case on other grounds, noted that the lower courts were divided on the issue, citing *Pine Lake Village Apart-*

*ment Co.*, 19 B.R. 819, 833 (Bkrtcy.S. D.New York 1982), as holding it had been eliminated, and this Court's opinion in *In re Sawmill Hydraulics, Inc.*, 72 B.R. 454, 456, n. 1 (Bkrtcy.C.D.Ill.1987), to the effect that it had not been eliminated.

This Court's opinion in *In re Sawmill Hydraulics, Inc., supra* relied on the Seventh Circuit Court of Appeals decision in *In re Potter Material Service, Inc.*, 781 F.2d 99 (7th Cir.1986), which stated as follows:

The courts have recognized an exception, however, to this "absolute-priority" rule. An equity-interest owner may retain an interest in the debtor corporation so long as the owner invests new capital into the corporation. *See Case v. Los Angeles Lumber Products Co., Ltd.*, 308 U.S. 106, 60 S.Ct. 1, 84 L.Ed. 110 (1939); *In re Landau Boat Co.*, 13 B.R. 788 (Bankr.W. D.Mo.1981); *In re Marston Enterprises*, 13 B.R. 514 (Bankr.E.D.N.Y.1981). The new capital investment must (1) represent a substantial contribution and (2) equal or exceed the value of the retained interest in the corporation. *See Case*, 308 U.S. at 121, 60 S.Ct. at 10; *Landau Boat*, 13 B.R. at 792–93; *Marston Enterprises*, 13 B.R. at 518. The sole issue in this case is whether Ochstein comes within this exception to the "absolute-priority" rule in section 1129(b)(2).

Subsequently, the Seventh Circuit Court of Appeals in *In re Stegall, supra*, questioned the viability of the rule, stating:

The "fresh capital" exception to the absolute-priority rule pre-dates the Bankruptcy Code of 1978; does it survive it? We assumed so without discussion of the question in *In re Potter Material Service, Inc.*, 781 F.2d 99, 101 (7th Cir.1986). *In re U.S. Truck Co.*, 800 F.2d 581, 588 (6th Cir.1986), similarly assumes without discussion that the exception survived the Code. The Solicitor General's amicus curiae brief in *Norwest Bank Worthington v. Ahlers*, No. 86–958, O.T.1987, at pp. 17–23 (filed Aug. 6, 1987), argued that this is wrong, pointing out that the Code codifies the exceptions to the absolute-priority rule and that the fresh-capital exception is not in the list. *See also*

H.R.Rep. No. 595, 95th Cong., 1st Sess. 413–14 (1977). The Solicitor General noted that creditors are better judges of what is in their self-interest than bankruptcy judges, so if most or at least a substantial minority of creditors (weighted by debt) are not impressed by the debtor's proposal to infuse new capital into the sinking enterprise, that ought to be the end of it. *See also* Baird & Jackson, *Bargaining After the Fall and the Contours of the Absolute Priority Rule,* 55 U.Chi.L.Rev. 738, 746 n.23, 757 n.48 (1988). The Supreme Court declined the Solicitor General's invitation to resolve the issue. *Norwest Bank Worthington v. Ahlers,* [485 U.S. 197] 108 S.Ct. 963, 967 n.3 [99 L.Ed.2d 169] (1988). No more need we try to resolve it today, since this case, like *Ahlers,* is not within the fresh-capital exception even if that exception survived the enactment of the 1978 code. We emphasize, however, that the issue is an open one in this circuit, *Potter* notwithstanding. A point of law merely assumed in an opinion, not discussed, is not authoritative. *See,* e.g., *Pennhurst State School & Hospital v. Halderman,* 465 U.S. 89, 119 and n. 29 [104 S.Ct. 900, 918 and n. 29, 79 L.Ed.2d 67] (1984); *United States v. Kucik,* 844 F.2d 493, 498 (7th Cir.1988); *United States v. Crawley,* 837 F.2d 291, 293 (7th Cir. 1988).

Prior to the adoption of the Bankruptcy Code, Section 221 of the Bankruptcy Act provided that a judge shall confirm a Chapter 10 reorganization plan if satisfied that it was "fair and equitable." *Northern Pacific Railway Co. v. Boyd,* (1913) 228 U.S. 482, 33 S.Ct. 554, 57 L.Ed. 931; *Case v. Los Angeles Lumber Products Co., Ltd.,* (1939) 308 U.S. 106, 60 S.Ct. 1, 84 L.Ed. 110. The United States Supreme Court in construing the phrase "fair and equitable", established the absolute priority rule and the fresh capital exception to it. The absolute priority rule under the Act requires senior classes to be paid in full before junior equity holders can receive any property under the plan. *Boyd, supra; Case, supra.* The exception permits junior equity holders to receive property under the plan

even though senior classes are not paid in full, if a contribution of fresh capital is necessary and it is substantial and equals or exceeds the value of the interest being retained by the junior equity holder. *Case, supra.*

When the Bankruptcy Code was adopted in 1978, Chapter X and XI of the Act were replaced by Chapter 11 of the Bankruptcy Code. Section 1129 of the Bankruptcy Code is the key provision. 11 U.S.C. Section 1129. Section 1129(b)(1) requires a court to confirm a plan if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan. Section 1129(b)(2)(B) continues the absolute priority rule. That section provides in part as follows:

(2) For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:

. . . .

(B) With respect to a class of unsecured claims—

(i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or

(ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property.

Two different arguments have been made in attacking the absolute priority rule and the fresh capital exception. The first attacks one of the central premises of the law of corporate reorganization upon which *Boyd* and *Case* are based, that a special forum and a special set of rules are required where intermediate creditors do not receive full payment. The proponents of this argument contend that bargaining between a creditor and a debtor is a preferable method of determining who will control the assets of an insolvent debtor, than for a bankruptcy court to make that deter-

mination. *See* Baird & Jackson, *Bargaining After the Fall and the Contours of the Absolute Priority Rule,* 55 U.Chi.L. Rev. 738 (1988).

The second argument finds its roots in the first argument, but is a more technical one. It is that Section 1129 of the Bankruptcy Code has eliminated the fresh capital exception. The United States in the amicus curiae brief filed in *Ahlers, supra,* stated the argument for holding that Section 1129 has eliminated the exception as follows:

The Bankruptcy Code has replaced the judicially developed "fair and equitable" test of the old Bankruptcy Act with a statutorily prescribed one. The Code provides that a plan is fair and equitable, with respect to an impaired, dissenting class of unsecured creditors, in two: and only two—circumstances (11 U.S.C. & Supp III) 1129(b)(2)(B):

(i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or

(ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property.

Even when equity holders make new capital contributions as part of the plan, the interest that they "receive or retain under the plan" is received or retained on account of their pre-petition claim or interest in property of the estate.[18] It is therefore forbidden by the express terms of Section 1129(b)(2)(B) unless all unsecured creditors in the dissenting class receive "property of a value, as of the effective date of the plan, equal to the allowed amount of [their] claim[s]." The language of the Code admits of no other conclusion.

[18] That is clear because there is no provision of the Bankruptcy Code that could even conceivably be read to allow, over the objection of a class of creditors, the participation in a plan of a person or entity that contributed new capital but had no prior claim or interest in any property of the estate. Any rule that allowed equity holders, over the objection of a class of creditors, to participate in the plan by contributing new capital would thus necessarily create a special rule for them on account of their prior claim or interest in property of the estate.

Those supporting the continued viability of the exception answer the technical argument by arguing that:

Although developed under the former Bankruptcy Act, the new contribution concept applies in Chapter 11 cases. Section 1129(b) prohibits owners from retaining or receiving any property "on account" of their prior interests unless creditors receive full value. In a new capital case, however, the source of the owners' interest in the reorganized company is their new contribution. Ownership is not retained "on account" of the prior interest. (Footnote omitted)

Nimmer, *Negotiated Bankruptcy Reorganization Plans: Absolute Priority And New Value Contributions,* 36 Emory Law Journal 1009 (1987).

In this Court's view, the answers to the arguments attacking the exception are the same. The fresh capital exception is viable until eliminated by a higher court. The fresh capital exception developed by the Supreme Court has become a deeply engraved concept under the bankruptcy laws. There is nothing in the legislative history which indicates that Congress, in enacting Section 1129, intended to eliminate this long standing concept. Although there is some judicial authority which indicates that the exception is no longer viable, most courts have concluded that the exception survives the transition from the Bankruptcy Act to the Bankruptcy Code. Compare *In re Pine Lake Village Apartment Co., supra,* to those cases cited in Peeples, *Staying In: Chapter 11, Close Corporations And The Absolute Priority Rule,* 63 American Bankruptcy Law Journal, 65, at 77 (1989). Included in the latter group of cases is the decision of the Circuit Court of Appeals for the Seventh Circuit in *In re Potter Material Service, Inc., supra.* Notwithstanding the statement in *In re Stegall, supra,* it is better judicial policy for this Court to apply the long standing con-

cept, as was done in *In re Potter Material Service, Inc., supra,* until the United States Supreme Court or the Circuit Court of Appeals for the Seventh Circuit rules the exception no longer exists. Until then, this Court recognizes that the exception lends itself to possible misuse, which has to be countered by a careful application of the exception.

■ Having decided that the fresh capital exception to the absolute priority rule is still viable, this Court now turns its attention to the issue of whether the Debtors' plan falls within the scope of the exception, by determining whether the father's release of debt constitutes a fresh capital contribution, and if so, whether that contribution is substantial.

A capital contribution is reflected on the balance sheet, and one way of analyzing the issue is to determine the effect of the father's release of debt on the balance sheet. For analytical purposes, it is assumed that a debtor's simplified balance sheet appears as follows:

| | |
|---|---|
| Current assets | $100.00 |
| Land and Equipment | $100.00 |
| Total Assets | $200.00 |
| Current Liabilities | $150.00 |
| Long Term Liabilities | $150.00 |
| Total Liabilities | $300.00 |
| Equity | [$100.00] |

If it is then assumed that a creditor relinquishes a current claim of $50.00, a debtor's balance sheet would then appear as follows:

| | |
|---|---|
| Current assets | $100.00 |
| Land and Equipment | $100.00 |
| Total Assets | $200.00 |
| Current Liabilities | $100.00 |
| Long Term Liabilities | $150.00 |
| Total Liabilities | $250.00 |
| Equity | [$ 50.00] |

Therefore, a debtor's capital picture would show an improvement by $50.00. The fact that a creditor's claim is partially secured would not affect the balance sheet, as that status merely determines which of the creditors receive the asset subject to the security interest.

There is, however, a more basic consideration. In *Case v. Los Angeles Lumber Products Co., Ltd., supra,* a cash contribution was being made, and the court, in analyzing the issue, quoted from *Kansas City Terminal Ry. Co. v. Central Union Trust Co.,* 271 U.S. 445, 46 S.Ct. 549, 70 L.Ed. 1028 (1926), as follows:

> "Generally, additional funds will be essential to the success of the undertaking, and it may be impossible to obtain them unless stockholders are permitted to contribute and retain an interest sufficiently valuable to move them. In such or similar cases the chancellor may exercise an informed discretion concerning the practical adjustment of the several rights."

Later on, the court in *Case* stated as follows:

> It is, of course, clear that there are circumstances under which stockholders may participate in a plan of reorganization of an insolvent debtor. This Court, as we have seen, indicated as much in *Northern Pacific Ry. Co. v. Boyd, supra,* and *Kansas City Terminal Ry. Co. v. Central Union Trust Co., supra.* Especially in the latter case did this Court stress the necessity, at times, of seeking new money "essential to the success of the undertaking" from the old stockholders. Where that necessity exists and the old stockholders make a fresh contribution and receive in return a participation reasonably equivalent to their contribution, no objection can be made. But if these conditions are not satisfied the stockholder's participation would run afoul of the ruling of this Court in *Kansas City Terminal Ry. Co. v. Central Union Trust Co., supra,* that "Whenever assessments are demanded, they must be adjusted with the purpose of according to the creditor his full right of priority against the corporate assets, so far as possible in the existing circumstances."

The essence of the fresh capital exception, taken from the early cases, is that money or something in money's worth must be *contributed.* A forgiveness of debt is only an accounting entry which affects just the liability side of the balance sheet and creates no new funds. While it

may lessen the darkness of a dismal picture, it does little to enhance the debtor's prospects of reorganization. This much was insinuated by the Supreme Court in *Case,* where the court, in holding that the stockholders' "influence in the community" and "continuity of management" did not constitute a capital contribution, stated:

> Such items, on facts present here, are not adequate consideration for issuance of the stock in question. On the facts of this case they cannot be translated into money's worth reasonably equivalent to the participation accorded the old stockholders. They have no place in the asset column of the balance sheet of the new company.

Therefore, this court concludes that the forgiveness of debt by the Debtors' father does not constitute a fresh capital contribution.

In *In re Future Energy Corp.,* 83 B.R. 470 (Bkrtcy.S.D.Ohio 1988), the court, citing this Court's decision in *In re Sawmill Hydraulics, Inc., supra,* held that a shareholder's release of claim may be deemed to be a form of capital contribution. Broadly construing *Sawmill* and *Potter Material, supra,* the court stated that a capital contribution will be considered to have been made where the transaction both benefits the debtor and places the shareholder in a position of economic risk. Notwithstanding the contrary result reached by the court in *In re Future, supra,* this Court's decision in this case is not inconsistent with its decision in *Sawmill.* In *Sawmill,* there was an injection of funds from a bank loan of $50,000.00 to the debtor which the shareholders guaranteed. But for the guaranty, the loan would not have been made and the guaranty put the shareholders in a position of economic risk. While a borrowing by a debtor itself will not constitute a capital contribution, where there is a guaranty by a shareholder which is required by the lender and the shareholder is placed at risk, a capital contribution may be found. But there must be, in any event, a contribution in money or money's worth to provide necessary operating funds for a reorganized debtor.

■ Lastly, even if the release of indebtedness could be considered a capital contribution, it cannot be considered substantial. In *In re Olson,* 80 B.R. 935 (Bkrtcy.C.D.Ill. 1987), aff'd on appeal February 8, 1989, this Court stated as follows:

> The decided cases have not developed guidelines to be considered in determining if a contribution of capital is "substantial" so as to satisfy Section 1129(b)(2)(B)(ii). In general, the word "substantial" is a relative one. *Atchison, T. & S.F. Ry. Co. v. Kings County Water Dist.,* [47 Cal.2d 140] 302 P.2d 1 (Cal.1956); *State v. Pahl,* 254 Minn. 349, 95 N.W.2d 85 (1959); *Robinson v. North Am. Life & Cas. Co.,* [215 Cal.App.2d 111] 30 Cal.Rptr. 57 (Cal.Dist.Ct.App. 1963). It means something of value or worthwhile as compared to something without value or mere nominal value. *Bush v. Keystone Carbon Co.,* 211 Pa. Super. 422, 236 A.2d 231 (1967); *State v. Wieland,* 269 Wis. 262, 69 N.W.2d 217 (1955). The meaning of the word depends on the facts of each case and must be governed by the facts associated with the particular case at issue. *Busch v. Service Plastics, Inc.,* 261 F.Supp. 136 (N.D. Ohio 1966); *Fuhrman v. American Nat. Building & Loan Ass'n.,* 126 Cal.App. 202, 14 P.2d 601 (1932). In the context of this case, a mathematical formula cannot be devised because of the lack of certainty regarding the future value of the reorganized debtors. *Matter of U.S. Truck Co., Inc.,* 47 B.R. 932 (D.C.1985), aff'd *In re U.S. Truck Co., Inc.,* 800 F.2d 581 (6th Cir.1986). Nonetheless, this Court perceives the following considerations to be relevant in making the determination. Inasmuch as the application of the exception involves the relationship of the Debtors to the dissenting class, one factor to be considered is the amount of the contribution compared to the amount of unsecured debt due the dissenting class. In this case the $5,000.00 contribution amounts to a mere 3.33% of the approximate $151,000.00 due on the CREDITOR's unsecured claim and 1.56% of the approximate $320,-000.00 due all unsecured creditors. This

disparity alone militates against a finding the contribution is "substantial". Another factor to be considered is the amount of the write down of the Debtors' mortgage and the prospects of future changes to the value of the mortgaged farm land. The write down was sizeable and this Court notes that farm land prices have at least stabilized, with some indication that as to some farm land, prices have started a modest recovery from their recent losses. It would not be appropriate to permit the Debtors to retain the farm land, through a small payment, at a time when the value of farm land may be starting to increase. Through the good fortune of "timing" the Debtors would have the best of two worlds: a write down of their mortgage and increasing farm land value.

In *In re Stegall, supra,* the court stated:
The $2,000 in quantified new capital contributed to the farm is too little to warrant the drastic remedy of a cramdown. Cf. *In re Rudy Debruycker Ranch, Inc.,* 84 B.R. 187, 190 (Bankr.D. Mont.1988). Cram-down comes into play only when a substantial minority of creditors are dissatisfied with the plan of reorganization and want to pursue their other remedies. (If more than one-half of the creditors, holding at least two-thirds of the total unsecured debt, approve the plan, it goes into effect automatically. See 11 U.S.C. Section 1126(c).) So drastic an interference with property rights is not warranted in a case such as this where the contribution that the debtor proposes to make to the enterprise is nominal and he argues that that is good enough because the part of the estate that he seeks to retain—here, most of the estate—is worthless. If the contribution is nominal, the protesting creditors can hardly be thought duly compensated for surrendering against their will their remedies of foreclosure and forced sale, meager as those remedies may turn out to be if the value of the bankrupt estate is small relative to the secured debt.

Applying these concepts to the case before this Court, the Court concludes that a $30,000.00 capital contribution is insignificant. The primary purpose of the Debtors' plans is to affect two secured creditors through a write down of the secured debt to the fair market value of their security.[2]

Almost all of the unsecured debt to be serviced by the Plan of Reorganization arises out of the write down of two secured debts to the fair market value of their security. The bulk of that figure is owed to the BANK. The $30,000.00 fresh capital contribution amounts to just 2.7% of the approximately $1,100,000.00 due creditors in the unsecured class, and 3.3% due the BANK on its portion of the claim to be treated as unsecured. A capital contribution which relates to unsecured creditors in such fashion cannot be considered substantial.

**2.** ROBERT's schedules reflect that he owes no priority creditors or any taxes to either the United States or any state or local taxing authority. He owes four secured creditors; the BANK, the Farmers Home Administration, the Community Bank and Trust Company of Canton, and his father. He has two unsecured creditors, Robert Wright for $40,000.00, and a credit card for $1,608.00. His Plan proposes to have his father forego the debt owed him, pay the Canton bank in full, reduce the amount of the debt due the BANK from $1,481,000.00 to $581,104.00, and reduce the secured debt of the Farmers Home Administration from $284,000.00 to $118,565.00. Unsecured creditors under his Plan would be the BANK for $899,896.00, Farmers Home Administration, $165,435.00, Robert Wright $40,000.00, and a credit card company $1,608.00.

DELBERT's schedules reflect that he owes no priority creditors or any taxes to either the United States or any state or local taxing authority. He owes four secured creditors; the BANK, the Farmers Home Administration, Anric, Inc., and his father. He has three unsecured creditors, Robert Wright for $40,000.00, Jefferson Trust & Savings Bank for $3,754.00, and the Sheridan Bank for an unknown amount. His Plan proposes to have his father forego the debt owed him, pay Anric, Inc. in full, reduce the amount of the debt due the BANK from $1,481,000.00 to $581,104.00, reduce the secured debt of the Farmers Home Administration from $284,000.00 to $118,565.00. Unsecured creditors under his Plan would be the BANK for $899,896.00, Farmers Home Administration, $165,435.00, Robert Wright $40,000.00, and Jefferson Trust & Savings Bank for $3,754.00. There is no reference to the debt of the Sheridan Bank.

This is particularly true where in exchange the Debtors will be keeping their farmland. As was pointed out in *Olson*, through the good fortune of timing, Debtors can achieve the best of two worlds—a write down of the mortgage debt and a subsequent increase in farmland value. In this case, the Debtors anticipate a sizeable write down of their mortgage debt. Although no evidence was adduced at the hearing, it is common knowledge that the value of farmland has bottomed out, and the value of average quality farmland has stabilized, and is increasing for good farmland. With farmland values on the rise, the Debtors would, indeed, have the best of both worlds. If the Debtors wish to receive the benefit of increased farmland values, then as is pointed out in *In re Stegall, supra*, they must compensate the creditors with something more than a nominal contribution. If they are not in a position to do so, then any future increase in value should accrue to the BANK which holds a mortgage to secure all of the debt due it in the amount of $1,481,635.00.

IT IS, THEREFORE, ORDERED that

1. The BANK's objections to the disclosure statement be and the same are hereby allowed.

2. The Debtors are given thirty (30) days within which to file an amended Plan of Reorganization and Disclosure Statement.

3. If amended Plans of Reorganization and Disclosure Statements are not filed within thirty days, then the Chapter 11 proceedings will be dismissed.