**In re Delbert SNYDER and Deanna J. Snyder, Debtors.**

**In re Robert SNYDER, Debtor.**

**Bankruptcy Nos. 88–81234, 88–81235.**

United States Bankruptcy Court, C.D. Illinois.

Oct. 13, 1989.

Gregg N. Grimsley Peoria, Ill., for debtors.

Douglas R. Lindstrom, Mustain & Lindstrom, Galesburg, Ill., for Farm Credit Bank of St. Louis.

OPINION

WILLIAM V. ALTENBERGER,
Bankruptcy Judge.

This matter came on to be heard upon the Debtors' Amended Disclosure Statement. Delbert Snyder (DELBERT) and Robert Snyder (ROBERT) are brothers who jointly own and operate a farm in Central Illinois. Each filed a separate Chapter 11 proceedings.[1] DELBERT's schedules show secured debts totaling $1,903,622.00, unsecured debt of $23,-754.00, and property totaling $687,896.00, of which $581,000.00 is attributable to real estate. ROBERT's schedules show secured debt of $1,891,622.00, unsecured debt of $21,608.00, and property totaling $659,-047.00, of which $569,700.00 is attributable to real estate. Included in these figures is joint debt of $126,794.00 owed to their father, secured by farm vehicles valued at $20,000.00 and $1,481,635.00 due the Farm Credit Bank of St. Louis (BANK), secured by their jointly owned farmland which they valued for the purpose of their plans at $581,104.00.

Their original plans of reorganization provided that they would retain the jointly owned farmland, write down the BANK's secured debt to the value of the farmland, pay unsecured creditors 10%, and that their father would release his claims. The BANK filed an objection to their original disclosure statements and filed motions to dismiss the Chapter 11 proceedings. The basis for the objections and the motions to dismiss were the same. The BANK contended the plans failed to meet the requirements of the absolute priority rule found in 11 U.S.C. Section 1129(b)(2)(B)(ii), in that unsecured creditors would only be receiving 10% while the Debtors retain their farm. The Debtors responded by contending they came within the "fresh capital" exception to the absolute priority rule by making a fresh capital contribution of $30,-000.00 through their father's release of his secured claim valued at $20,000.00 and his unsecured claim of approximately $100,-000.00, which equates to a $10,000.00 savings under the plan. The BANK countered by arguing the fresh capital exception was eliminated with the adoption of the Bankruptcy Code, and even if it was still viable the $30,000.00 did not constitute a fresh capital contribution.

There were two issues before the Court. First, whether the fresh capital exception to the absolute priority rule was still viable under the Bankruptcy Code; and second, if so, did the father's release of his claims constitute a contribution of fresh capital. In In re Snyder, 99 B.R. 885 (Bkrtcy.C.D. Ill.1989), this Court held that the fresh capital exception to the absolute priority rule was still viable, and that the father's release of his claims did not constitute a contribution of fresh capital.

The Debtors then filed Amended Disclosure Statements and Plans of Reorganization. They now propose as follows:

1. From future earnings, to pay unsecured creditors 10% of their claims, without interest, at the rate of 1% per year for ten years.

2. Upon confirmation, with a gift to the Debtors from a third party, to contribute the sum of $30,000.00.

3. To provide the use of machinery free and clear of their father's lien.

4. To pay the value of the machinery, $20,000.00, to unsecured creditors over a period of five years.

The BANK again objected on the basis that it controls the unsecured creditor class and will not vote for confirmation unless it is paid in full. The BANK argues that the Amended Plan is basically the same plan as proposed before and which was rejected for failure to comply with the absolute priority rule.

The Debtors argue that there is compliance with the fresh capital exception to the absolute priority rule, as

1. A $30,000.00 cash contribution is being made; and

2. The unsecured creditors will receive the value of the machinery, $20,000.00, over a five year period.

1. Included in DELBERT's was his wife, Deanna J.

The BANK's attack against the Amended Disclosure Statements and Plans presents the same issues previously decided by this Court. As to the first issue of whether the fresh capital exception to the absolute priority rule is still viable under the Bankruptcy Code, for the reasons stated in its previous Opinion, this Court again holds that it is. *See In re Snyder, supra,* pp. 886–89.

■ Having again decided that the fresh capital exception to the absolute priority rule is still viable, this Court now turns its attention to the issue of whether the Debtors' amended plans fall within the scope of the exception. In order to take advantage of the exception, the Debtors must make an investment of new capital. *In re Potter Material Service, Inc.,* 781 F.2d 99 (7th Cir.1986). That investment must be "up front" and cannot be in the form of future payments from the operation of the farm. *In the Matter of Stegall,* 85 B.R. 510 (C.D. Ill.1987), aff'd on appeal, 865 F.2d 140 (7th Cir.1989), *In re Olson,* 80 B.R. 935 (Bkrtcy. C.D.Ill.1987), aff'd on appeal, J. Mihm, February 8, 1989, No. 88–4052; *See also In re Pecht,* 57 B.R. 137 (Bkrtcy.E.D.Va.1986).

■ The Debtors' proposal to pay unsecured creditors the value of the machinery, $20,000.00, over a five year period through the use of the machinery, free of their father's lien, fails to meet this standard, as the payments will not be "up front", but will be future payments from the farm's operation. Furthermore, as was stated in this Court's previous opinion in *In re Snyder, supra,* at page 889:

A capital contribution is reflected on the balance sheet, and one way of analyzing the issue is to determine the effect of the father's release of debt on the balance sheet. For analytical purposes, it is assumed that a debtor's simplified balance sheet appears as follows:

| | |
|---|---|
| Current assets | $100.00 |
| Land and Equipment | $100.00 |
| Total Assets | $200.00 |
| Current Liabilities | $150.00 |
| Long Term Liabilities | $150.00 |
| Total Liabilities | $300.00 |
| Equity | [$100.00] |

If it is then assumed that a creditor relinquishes a current claim of $50.00, a debtor's balance sheet would then appear as follows:

| | |
|---|---|
| Current assets | $100.00 |
| Land and Equipment | $100.00 |
| Total Assets | $200.00 |
| Current Liabilities | $100.00 |
| Long Term Liabilities | $150.00 |
| Total Liabilities | $250.00 |
| Equity | [$ 50.00] |

Therefore, a debtor's capital picture would show an improvement by $50.00. The fact that a creditor's claim is partially secured would not affect the balance sheet, as that status merely determines which of the creditors receive the asset subject to the security interest.

There is, however, a more basic consideration. In *Case v. Los Angeles Lumber Products Co. Ltd., supra* [308 U.S. 106, 60 S.Ct. 1, 84 L.Ed. 110 (1939)] a cash contribution was being made, and the court, in analyzing the issue, quoted from *Kansas City Terminal Ry. Co. v. Central Union Trust Co.,* 271 U.S. 445 [46 S.Ct. 549, 70 L.Ed. 1028] as follows:

"Generally, additional funds will be essential to the success of the undertaking, and it may be impossible to obtain them unless stockholders are permitted to contribute and retain an interest sufficiently valuable to move them. In such or similar cases the chancellor may exercise an informed discretion concerning the practical adjustment of the several rights."

Later on, the court in *Case* stated as follows:

It is, of course, clear that there are circumstances under which stockholders may participate in a plan of reorganization of an insolvent debtor. This Court, as we have seen, indicated as much in *Northern Pacific Ry. Co. v. Boyd, supra* [228 U.S. 482, 33 S.Ct. 554, 57 L.Ed. 931 (1913)] and *Kansas City Terminal Ry. Co. v. Central Union Trust Co., supra.* Especially in the latter case did this Court stress the necessity, at times, of seeking new money "essential to the success of the undertaking" from the old stockhold-

ers. Where that necessity exists and the old stockholders make a fresh contribution and receive in return a participation reasonably equivalent to their contribution, no objection can be made. But if these conditions are not satisfied the stockholder's participation would run afoul of the ruling of this Court in *Kansas City Terminal Ry. Co. v. Central Union Trust Co., supra,* that "Whenever assessments are demanded, they must be adjusted with the purpose of according to the creditor his full right of priority against the corporate assets, so far as possible in the existing circumstances."

The essence of the fresh capital exception, taken from the early cases, is that money or something in money's worth must be *contributed.* A forgiveness of debt is only an accounting entry which affects just the liability side of the balance sheet and creates no new funds. While it may lessen the darkness of a dismal picture, it does little to enhance the debtor's prospects of reorganization. This much was insinuated by the Supreme Court in *Case,* where the court, in holding that the stockholders' "influence in the community" and "continuity of management" did not constitute a capital contribution, stated:

> Such items, on facts present here, are not adequate consideration for issuance of the stock in question. On the facts of this case they cannot be translated into money's worth reasonably equivalent to the participation accorded the old stockholders. They have no place in the asset column of the balance sheet of the new company.

Therefore, this Court concludes that the forgiveness of debt by the Debtors' father does not constitute a fresh capital contribution.

The Debtors' current proposal to pay creditors the $20,000.00 value of the machinery with their father releasing his lien and claims is no different from that originally put forth. Neither action improves the asset column of the Debtors' balance sheet.

■ The next issue arising out of the Amended Disclosure Statements and Plans is whether the $30,000.00 cash contribution constitutes a substantial contribution of fresh capital. In its previous Opinion, this Court stated, 99 B.R. at pages 890–91:

> In *In re Olson,* 80 B.R. 935 (Bkrtcy.C.D. Ill.1987), aff'd on appeal February 8, 1989, this Court stated as follows:
>
> The decided cases have not developed guidelines to be considered in determining if a contribution of capital is "substantial" so as to satisfy Section 1129(b)(2)(B)(ii). In general the word "substantial" is a relative one. *Atchison, T. & S.F. Ry. Co. v. Kings County Water Dist.,* [47 Cal.2d 140] 302 P.2d 1 (Cal.1956); *State v. Pahl,* 254 Minn. 349, 95 N.W.2d 85 (1959); *Robinson v. North Am. Life & Cas. Co.,* [215 Cal.App.2d 111] 30 Cal.Rptr. 57 (Cal.Dist.Ct.App. 1963). It means something of value or worthwhile as compared to something without value or mere nominal value. *Bush v. Keystone Carbon Co.,* 211 Pa. Super. 422; 236 A.2d 231 (1967); *State v. Wieland,* 269 Wis. 262, 69 N.W.2d 217 (1955). The meaning of the word depends on the facts of each case and must be governed by the facts associated with the particular case at issue. *Busch v. Service Plastics, Inc.,* 261 F.Supp. 136 (N.D. Ohio 1966); *Fuhrman v. American Nat. Building & Loan Ass'n.,* 126 Cal.App. 202, 14 P.2d 601 (1932). In the context of this case, a mathematical formula cannot be devised because of the lack of certainty regarding the future value of the reorganized debtors. *Matter of U.S. Truck Co., Inc.,* 47 B.R. 932 (E.D. Mich.1985), aff'd *In re U.S. Truck Co., Inc.,* 800 F.2d 581 (6th Cir.1986). Nonetheless, this Court perceives the following considerations to be relevant in making the determination. Inasmuch as the application of the exception involves the relationship of the Debtors to the dissenting class, one factor to be considered is the amount of the contribution compared to the amount of unsecured debt due the dissenting class. In this case the $5,000.00 contribution amounts to a mere 3.33% of the approximate $151,000.00

due on the CREDITOR's unsecured claim and 1.56% of the approximate $320,000.00 due all unsecured creditors. This disparity alone militates against a finding the contribution is "substantial". Another factor to be considered is the amount of the write down of the Debtors' mortgage and the prospects of future changes to the value of the mortgaged farm land. The write down was sizeable and this Court notes that farm land prices have at least stabilized, with some indication that as to some farm land, prices have started a modest recovery from their recent losses. It would not be appropriate to permit the Debtors to retain the farm land, through a small payment, at a time when the value of farm land may be starting to increase. Through the good fortune of "timing" the Debtors would have the best of two worlds: a write down of their mortgage and increasing farm land value.

In *In re Stegall, supra,* the court stated:

The $2,000 in quantified new capital contributed to the farm is too little to warrant the drastic remedy of a cramdown. Cf. *In re Rudy Debruycker Ranch, Inc.,* 84 B.R. 187, 190 (Bankr.D. Mont.1988). Cram-down comes into play only when a substantial minority of creditors are dissatisfied with the plan of reorganization and want to pursue their other remedies. (If more than one-half of the creditors, holding at least two-thirds of the total unsecured debt, approve the plan, it goes into effect automatically. See 11 U.S.C. Section 1126(c).) So drastic an interference with property rights is not warranted in a case such as this where the contribution that the debtor proposes to make to the enterprise is nominal and he argues that that is good enough because the part of the estate that he seeks to retain—here, most of the estate—is worthless. If the contribution is nominal, the protesting creditors can hardly be thought duly compensated for surrendering against their will their remedies of foreclosure and forced sale, meager as those remedies may turn out to be if the value of the bankrupt estate is small relative to the secured debt.

Applying these concepts to the Debtors' Amended Plans, the Court concludes that a $30,000.00 capital contribution is insignificant. The primary purpose of the Debtors' Plans is to affect two secured creditors through a write down of the secured debt to the fair market value of their security.[2] Almost all of the unsecured debt to be serviced by the Amended Plans of Reorganization arises out of the write down of the two secured debts. The bulk of that figure is owed to the BANK. The $30,000.00 fresh capital contribution amounts to just 2.7% of the approximately $1,100,000.00 due unsecured creditors, and 3.3% due the BANK on the unsecured portion of its claim. The capital contribution which re-

---

**2.** ROBERT's schedules reflect that he owes no priority creditors or any taxes to either the United States or any state or local taxing authority. He owes four secured creditors; the BANK, the Farmers Home Administration, the Community Bank and Trust Company of Canton, and his father. He has two unsecured creditors, Robert Wright for $40,000.00, and a credit card for $1,608.00. His Plan proposes to have his father forego the debt owed him, pay the Canton bank in full, reduce the amount of the secured debt due the BANK from $1,481,000.00 to $581,104.00, and reduce the secured debt of the Farmers Home Administration from $284,000.00 to $118,565.00. Unsecured creditors under his Plan would be the BANK for $899,896.00, Farmers Home Administration $165,435.00, Robert Wright $40,000.00, and a credit card company $1,608.00.

DELBERT's schedules reflect that he owes no priority creditors or any taxes to either the United States or any state or local taxing authority. He owes four secured creditors; the BANK, the Farmers Home Administration, Anric, Inc., and his father. He has three unsecured creditors, Robert Wright for $40,000.00, Jefferson Trust & Savings Bank for $3,754.00, and the Sheridan Bank for an unknown amount. His Plan proposes to have his father forego the debt owed him, pay Anric, Inc. in full, reduce the amount of the secured debt due the BANK from $1,481,000.00 to $581,104.00, reduce the secured debt of the Farmers Home Administration from $284,000.00 to $118,565.00. Unsecured creditors under his Plan would be the BANK for $899,896.00, Farmers Home Administration $165,435.00, Robert Wright $40,000.00, and Jefferson Trust & Savings Bank for $3,754.00. There is no reference to the debt of the Sheridan Bank.

lates to unsecured creditors in such a fashion cannot be considered substantial.[3]

This is particularly true where in exchange the Debtors will be keeping their farm. As was pointed out in *Olson*, through the good fortune of timing, Debtors can achieve the best of two worlds—a write down of the mortgage debt and a subsequent increase in farmland value. In this case, the Debtors anticipate a sizeable write down of their mortgage debt. Although no evidence was adduced at the hearing, it is common knowledge that the value of farmland has bottomed out, and the value of average quality farmland has stabilized, and is increasing for good farmland. With farmland values on the rise, the Debtors could, indeed, have the best of both worlds. If the Debtors wish to receive the benefit of increased farmland values, then as is pointed out in *In re Stegall, supra*, they must compensate the creditors with something more than a nominal contribution. If they are not in a position to do so, then any future increase in value should accrue to the BANK which holds a mortgage to secure all of the debt due it in the amount of $1,481,000.00.

The Debtors point out that under their plans the unsecured creditors are being compensated in the amount of $150,000.00 through (1) payment of 10%, or approximately $100,000.00, payable over a ten year period;[4] (2) immediate payment of the $30,000.00 being contributed; and (3) payment of $20,000.00 over five years to the use of the machinery. However, discounting the long term installment payments described at (1) and (3) above to their present value results in only approximately $77,000.00 going to unsecured creditors.[5] This amounts to 7% of the approximately $1,100,000.00 due unsecured creditors, and 8.6% due the BANK on the unsecured portion of its claim.

■ The factors this Court considered in *Olson* and the previous *Snyder* decision were not intended to be exclusive. In those cases, this Court compared the amount of the debtor's contribution to the amount of the unsecured debt, in addition to considering the reduction of the secured debt.[6] While these are valid and important considerations, the Debtors' contribution must also be viewed in terms of the operations of the Debtors as restructured. It seems clear that in establishing the exception the Supreme Court was requiring a contribution of new money in an amount essential to the success of the reorganization. So another consideration is whether the $30,000.00 cash contribution is sufficient to bring about a successful reorganization. Stated another way, will the contribution give the Debtors the financial strength to complete the Plan?

■ Financial strength can be evaluated through the application of a variety of financial ratios. These ratios can be categorized as liquidity ratios, coverage ratios, leverage ratios, operating ratios, and specific expense item ratios. In applying a ratio analysis, not all ratios are necessarily applicable to a particular entity, and the applicable standards may vary from industry to industry. It must also be kept in mind that in addition to the mathematical aspect of the analysis, that other factors such as the nature and quality of the assets need to be considered. At this stage of these particular proceedings, based upon the figures taken from the Debtors' own schedules and disclosure statements, which

---

3. Even if the $20,000.00 payment allocated to the value of the machinery constitutes a contribution to capital, the total contribution of $50,000.00 is insignificant as it would amount to just 4.5% of the amount due the unsecured creditor class, and 5.5% due the BANK.

4. The Debtors do not contend the 10% payment constitutes a contribution of new capital. Their point is that unsecured creditors are being compensated in exchange for Debtors' retention of the farm.

5. The discount factor used for this calculation is 11%, which is the interest rate the Debtors propose to pay the BANK on the secured portion of its claim.

6. Of course, what may be "substantial" in the eyes of the individual debtors will not necessarily be substantial in the viewpoint of the creditors.

are contested, there are two ratios which are applicable to the Debtors' situation.

The first ratio is a leverage ratio which compares total debt to tangible net worth. This ratio focuses on the relationship between total debt and the capital contributed by a debtor to determine the degree of protection afforded creditors by the debtor. A higher ratio generally indicates a greater risk being assumed by creditors, while a lower ratio generally indicates less risk for creditors. A low ratio usually indicates a greater flexibility to borrow in the future. A more highly leveraged debtor has less debt capacity.

In this case, after reorganization the Debtors would have to service approximately $790,000.00 of debt. The Debtors' assets approximate $660,000.00, leaving them with a negative net worth of approximately $130,000.00. Even with a $30,000.00 capital infusion, they still would be in a negative net worth position. With a negative net worth, should the Debtors experience further financial setbacks, they would have no equity cushion which could be used to satisfy the requirements of their plan. Nor would they be in a position to borrow for such purposes. In such event, their only alternative would be to sell a portion of their assets, the bulk of which consist of highly illiquid and fully mortgaged farmland. The proceeds from such a sale of this asset would go to secured creditors, leaving nothing for unsecured creditors. Furthermore, a sale of all or a portion of this asset which is essential to the reorganization would only serve to further weaken or destroy their ability to complete a successful reorganization.

There is yet another basic flaw to the Debtors' argument that the $30,000.00 constitutes a substantial fresh contribution of capital. As previously indicated, the purpose of requiring a contribution of new capital is to help provide financial strength to complete the plan. In this particular case, the $30,000.00 is being contributed, but is also immediately being used to pay creditors. Instead of providing financial strength throughout the period of the plan, the $30,000.00 is nothing more than an up front payment. While the exception requires that the capital contribution be up front, there is no requirement that creditors receive the same amount of money up front. In fact, to make such payment weakens the Debtors' financial structure over the life of the whole plan.

A debtor with a poor total debt to tangible net worth ratio might be able to successfully reorganize if the debtor has sufficient cash flow. A coverage ratio which compares net profits, plus depreciation, depletion, and amortization expenses, to the current portion of long term debt indicates the coverage of current maturities by cash flow from operations and measures the ability to service principal repayment. It is also an indicator of additional debt capacity. In this case, the Debtors' disclosure statements show a cash flow which generates net profits of approximately $1,750.00 and long term debt payments of approximately $100,000.00.[7] It is clear that the Debtors have no margin for error, and the slightest downturn in their operation would result in an inability to make the payments under the Plan.

Based upon these analyses, this Court concludes that the $30,000.00 capital contribution cannot be considered to be substantial, as it is insignificant in relation to the amount owed creditors, and it will not bring even a moderate degree of certainty that the plan of reorganization will succeed.

This Opinion is to serve as Findings of Fact and Conclusions of Law pursuant to Rule 7052 of the Rules of Bankruptcy Procedure.

See written Order.

## ORDER

For the reasons set forth in an Opinion filed this day,

---

7. Although the numerator of this particular ratio could increase slightly if depreciation and amortization expenses were factored in, the Debtors' schedules, plans, and disclosure statements do not indicate that the increase to the numerator would be significant. The Debtors are not entitled to claim depletion.

IT IS, THEREFORE, ORDERED that

1. The BANK's objection to the Amended Disclosure Statements be and the same is hereby allowed.

2. The Debtors are given thirty (30) days within which to file an Amended Plan of Reorganization and Disclosure Statement.

3. If Amended Plans of Reorganization and Disclosure Statements are not filed within thirty days, then the Chapter 11 proceedings will be dismissed.

DATED: October 13, 1989.