**In re Richard D. DRIMMEL and Sharon K. Drimmel, Debtor(s).**

**In re Lavurne J. UNRUH, Debtor.**

**Bankruptcy Nos. 87–40940–11, 86–41489–11.**

United States Bankruptcy Court, D. Kansas.

Nov. 14, 1989.

William E. Metcalf, Metcalf and Justus, Topeka, Kan., for debtors.

Charles Engel, Cosgrove, Webb & Oman, Topeka, Kan., for Rushville State Bank.

Carol Park Wood, U.S. Trustee, Wichita, Kan.

## MEMORANDUM OF DECISION

JAMES A. PUSATERI, Bankruptcy Judge.

These proceedings are before the court for determination whether the debtors' proposed plans satisfy the absolute priority rule found at 11 U.S.C. § 1129(b)(2)(B)(ii). They are only consolidated for decision of this issue. The debtors' plans were not accepted by at least one class of unsecured creditors, so the plans must satisfy the cramdown provisions of § 1129(b) to be confirmed by the court. The debtors in both cases appear by counsel William E. Metcalf of Metcalf and Justus. One of the Drimmels' creditors, Rushville State Bank (Bank), appears by counsel Charles T. Engel of Cosgrove, Webb & Oman. There are no other appearances. The court has heard evidence, reviewed the relevant pleadings, and considered the arguments of counsel, and is now ready to rule.

### FACTS

Only the following facts appear to be relevant to this issue.

*The Drimmels*

Richard and Sharon Drimmel operate a 220–acre family farm near Atchison, Kansas, legally a sole proprietorship in Richard's name. Richard also works as a foreman for a construction company. They filed a chapter 11 petition and ultimately a disclosure statement and plan. The plan defines five classes of claimants and proposes to pay about 5% on the unsecured creditors' claims. It also provides that the Drimmels will retain their property, subject to secured claims until completion of the plan and free of them thereafter, and will continue to manage their farm. The unsecured creditors, including the Bank, voted to reject the plan. The Drimmels then requested cram down under § 1129(b).

The debtors presented the testimony of a certified public accountant who determined, based on the discounted cash flow from the farm, that it had a going concern value of about $260. The CPA also testified that since the petition was filed the farm must have received almost $700 from Richard's construction wages because its expenses had exceeded its income by that amount. The plan calls for the debtors to donate their labor to the reorganized farm. The farm will receive income from the sale of crops, the rental of equipment, and the "hypothetical" rental of the farm house to the debtors. In addition, the plan relies on the Drimmels' son to continue to provide

diesel fuel and machinery repairs to the farm. The Drimmels' attorney is willing to have his fees, estimated to be at least $3,000, paid from their future earnings instead of property of the estate. They assert their labor, their donation of exempt property, and their attorney's deferral of his fees all constitute capital contributions from them to the estate.

*Unruh*

Lavurne Unruh operates a 450-acre farm, acts as a real estate broker, and apparently has the free use of certain grain storage bins. He filed a chapter 11 petition and ultimately an amended disclosure statement and plan. The amended plan defines thirteen classes of claimants and proposes to pay 2% on the unsecured creditors' claims. It also provides he will retain his property, subject to secured claims until completion of the plan and free of them thereafter, and will continue to manage his businesses. At least the unsecured creditors rejected his plan. He has requested cram down under § 1129(b).

Unruh claims his operation has little or no going concern value. He intends to contribute his exempt tools of trade to the reorganized enterprise. His attorney is willing to be paid additional fees of about $12,000 from Unruh's future earnings rather than from property of the estate. Like the Drimmels, Unruh asserts his donation of exempt property and his attorney's deferral of his fees would constitute capital contributions from him to the estate.

## CONCLUSIONS OF LAW

By their arguments, the debtors effectively concede, as they must, that *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 108 S.Ct. 963, 99 L.Ed.2d 169 (1988), stands as a substantial obstacle in the path to confirmation of their plans. There, the Supreme Court held the absolute priority rule prohibited the debtors from retaining their equity interest in their farm over the objection of their impaired unsecured creditors, and that their promise to contribute future labor, experience, and expertise did not satisfy any possible exception to the absolute priority rule. 485 U.S. at 201–05,

108 S.Ct. at 966–68. The Court also ruled only creditors, and not the courts, could accept a reorganization plan which does not provide the creditors adequate protection or does not satisfy the absolute priority rule, and rejected the debtors' assertion the absolute priority rule does not apply where the property they wish to retain has no value to the senior unsecured creditors. 485 U.S. at 206–10, 108 S.Ct. at 968–70. The debtors in the instant cases argue the Court did not decide whether the debtors in *Ahlers* had an "interest" in the bankruptcy estate "on account of" which they would receive or retain any property, nor, if they did, whether what they would receive or retain under their plan constituted "property." In the alternative, they argue they will be making substantial capital contributions under their plans with values far exceeding the value of any property they will receive under the plans.

The absolute priority rule comes into play in chapter 11 when a plan is confirmable but for its rejection by at least one class of claims that is impaired under the plan. In such a situation, 11 U.S.C. § 1129(b)(1) provides that the court may nevertheless approve the plan at the proponent's request if the plan does not discriminate unfairly and is fair and equitable with respect to the rejecting classes. Subsection (b)(2) then specifies certain requirements included in the "fair and equitable" standard. For unsecured claims, the requirement known as the absolute priority rule is stated in subparagraph (B):

> (i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or

> (ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property.

Since the unsecured creditors in these cases are to be paid only a small fraction of their claims, the second quoted paragraph

must be satisfied for the plans to be confirmed.

■ The debtors first contend sole proprietors should not be considered to have an "interest" in their businesses for purposes of the absolute priority rule. They engage in an extensive review of the development of the rule in the courts, its incorporation into the Bankruptcy Act and subsequent removal from one portion of the Act, and the legislative history of Code § 1129(b)(2)(B). They claim the courts developed the rule in order to deal with corporations, the rule was included in a chapter under the Act dealing with large public corporations and one dealing with smaller businesses but was subsequently removed from the latter as unworkable, and the legislative history nearly always speaks of the rule as protecting creditors and equity security holders. They then add that for corporations and general and limited partnerships, "equity interests have a separate legal identity from the enterprise being reorganized," but that sole proprietors have no such separate identity so sole proprietors alone have no "interest" for purposes of the absolute priority rule.

The court agrees the absolute priority rule was created to deal with corporate bankruptcies and the Supreme Court could have so limited it in *Ahlers*. In fact, one important distinction between corporations and proprietorships might justify not applying the rule to the latter: corporate stockholders are entitled to share in the control and profits of a corporation without providing any of their own time and labor while proprietors must provide time and labor or their businesses will not have any profits. However, the language Congress chose to use in § 1129(b)(2)(B)(ii), "junior claim or interest," is certainly broad enough to cover these debtors' rights in their businesses. Since the debtors in *Ahlers* ran a sole proprietorship and the Supreme Court treated them as having an "interest" under the statute, this court is not inclined to accept the argument based on the history of the rule now.

The debtors' reliance on the relative failure of Congress to mention sole proprietor-

ships in the legislative history of § 1129(b)(2)(B)(ii) misses an important point: the absolute priority rule does not operate to protect sole proprietors from anyone because there is no class junior to their interests to protect them from. Their interests are last in the priority ladder, so in discussing the interests to be protected by the rule, the legislative history would naturally not mention them. The debtors' argument is further weakened because they concede the possible application of the rule to sole proprietorships was discussed in the Congressional debates about the rule.

The debtors' assertion that the existence of legal definitions for interests held in corporations and partnerships establishes that those interests exist for purposes of the rule while the absence of such a definition for a sole proprietor's interest establishes that it does not exist for those purposes is also flawed. A general partner's interest in the partnership is "his or her share of the profits and surplus." Kan. Stat.Ann. § 56–326. The debtors concede a sole proprietor's interest in his or her business includes "a right to receive any remaining property" "after the property of the estate is utilized to pay superior allowed claims and interests." That is, the sole proprietor owns any surplus the business may have, just as a general partner shares in any surplus of the partnership. Quite simply, the reason there is no separate legal definition for a sole proprietor's interest in his or her business is that none is necessary where only one person owns a business. As the debtors put it, "[t]he business and the proprietor are one." Two or more people must be involved in a business for disputes about ownership interests to arise, so interests in such businesses are defined to help resolve those disputes. Certainly creatures of statute, e.g., corporations and limited partnerships, must be defined. No such definition is necessary where the business has a single owner.

The debtors also argue they had no "interest" in their businesses at the time of filing their bankruptcy petitions because the businesses were insolvent. However, they had possession or control of any tangi-

ble assets at that time and control of any intangible ones, and the court believes this must be considered an "interest" in the business. The debtors claim they gave up control of their businesses when they filed for bankruptcy and would retain control under their plans due to their status as debtors and not "on account of" their interest in the businesses. However, only because these debtors run sole proprietorships and therefore own all ownership interests in their businesses can it reasonably be said that they have given up control of their businesses and also have the status of debtors. For other forms of business, the business is the debtor. Corporations and partnerships do not own ownership interests in themselves; ultimately, people do. Like stockholders and partners, the debtors here retain property under their plans "on account of" their ownership interests, not due to the happenstance that they are "debtors" as well as "interest holders."

■ The debtors' second major line of attack is the argument any interest they would retain under their plans is not "property" for purposes of the absolute priority rule. They assert the Supreme Court's discussion of this theory in *Ahlers* was dicta and should not be followed by this court. The Supreme Court said:

Here, respondents contend, because the farm has no "going concern" value ..., any equity interest they retain in a reorganization of the farm is worthless, and therefore is not "property" under 11 U.S.C. § 1129(b)(2)(B)(ii) (1982 ed., Supp. IV).

We join the overwhelming consensus of authority which has rejected this "no value" theory. Even where debts far exceed the current value of assets, a debtor who retains his equity interest in the enterprise retains "property." Whether the value is "present or prospective, for dividends or only for purposes of control" a retained equity interest is a property interest to "which the creditors [are] entitled ... before the stockholders [can] retain it for any purpose whatever." *Northern Pacific R. Co. v. Boyd,* 228 U.S. [482,] 508[, 33 S.Ct.

554, 561, 57 L.Ed. 931 (1913) ]. Indeed, even in a sole proprietorship, where "going concern" value may be minimal, there may still be some value in the control of the enterprise; obviously, also at issue is the interest in potential future profits of a now-insolvent business. See *SEC v. Canandaigua Enterprises Corp.,* 339 F.2d 14, 21 (2d Cir.1964) (*Friendly, J.*). And while the Code itself does not define what "property" means as the term is used in § 1129(b), the relevant legislative history suggests that Congress' meaning was quite broad. " '[P]roperty' includes both tangible and intangible property." See H.R.Rep. No. 95–595, at 413, U.S.Code Cong. & Admin. News 1978, at 5787, 6369.

While the debtors see this discussion as "tentative and speculative," this court does not. Clearly, the Supreme Court has ruled the interest the debtors seek to retain in these cases is "property." The debtors attempt to distinguish the *Canandaigua* case because it involved a corporation, but the Court cited it only to indicate that the property sought to be retained in *Ahlers* included not only control of the sole proprietorship but also the right to receive future profits. The debtors' argument here must fail.

■ Finally, the debtors argue that even if the absolute priority rule applies to them, their plans satisfy the infusion-of-new-capital exception referred to by the U.S. Supreme Court in *Case v. Los Angeles Lumber Co.,* 308 U.S. 106, 121–22, 60 S.Ct. 1, 10, 84 L.Ed. 110 (1939) (*Los Angeles Lumber*) and the existence of which was questioned in *Ahlers.* This court does not believe any such exception to the rule exists under the Code. See *In re Winters,* 99 B.R. 658, 660–63 (Bankr.W.D.Pa.1989) (*discussing historical development of rule and legislative history of § 1129(b), and concluding no exception exists under Code*). The Code expressly does not allow debtors to retain any property on account of their interest in the business unless all objecting classes of creditors are paid in full. The only interest the debtors have in an insolvent business is the right of control and to receive future profits. What debt-

ors here contend is that they may retain their intangible interest if they pay its value by providing new capital to the business. This does not satisfy the requirement of § 1129(b)(2)(B)(i). It is not the value of the owners' retained interest which must be paid into the business for them to retain their interest in the business, it is the full amount of the claims of the rejecting unsecured class which must be paid to the creditors. The Code simply does not allow the owners to complain about losing their interests when they refuse or are unable to pay the rejecting creditors in full. This is hardly unfair considering the business carried on to the point of bankruptcy at least in part because its creditors allowed it to operate on credit.

The court is aware that in at least two cases decided after *Ahlers,* courts have discussed and accepted the view that the *Los Angeles Lumber* exception still applies under the Code. See *In re: Greystone III Joint Venture,* 102 B.R. 560, 574–75 (Bankr.W.D.Tex.1989) (*Greystone*); *In re: Snyder,* 99 B.R. 885, 886–89 (Bankr.C.D.Ill. 1989). In several other cases, courts have stated with little or no discussion that the exception still exists or have followed *Ahlers'* lead and decided only that the exception may exist but had not been met in the particular case. *In re: Stegall,* 865 F.2d 140, 141–42 (7th Cir.1989) (*not met*); *In re: Lettick Typografic, Inc.,* 103 B.R. 32, 34–37 (Bankr.D.Conn.1989) (*not met*); *In re: Johnson,* 101 B.R. 307, 309–10 (Bankr.M.D. Fla.1989) (*exists*); *In re: Yasparro,* 100 B.R. 91, 96–100 (Bankr.M.D.Fla.1989) (*exists*); *In re: Green,* 98 B.R. 981, 982 (9th Cir.B.A.P.1989) (*exists but not met*); *In re: 47th & Belleview Partners,* 95 B.R. 117, 119–20 (Bankr.W.D.Mo.1988) (*exists*). Another court issued a series of decisions, first apparently ruling the exception did not exist under the Code, *In re: Rudy Debruycker Ranch, Inc.,* 84 B.R. 187, 188–90 (Bankr.D.Mont.1988), then declining to decide whether it existed but ruling it was not met, *In re: Chandler,* 98 B.R. 516, 517–18 (Bankr.D.Mont.1988), and finally confirming a plan found to satisfy the exception, *In re: Henke,* 90 B.R. 451, 455–56 (Bankr.D.Mont.1988). This court believes

some comments regarding the reasoning of *Greystone* and *Snyder* are called for here.

The *Greystone* analysis of the Code's enactment of the absolute priority rule assumes that Congress' use of the words "fair and equitable" in § 1129(b)(1) carried with it both the absolute priority rule and the *Los Angeles Lumber* exception to it as prior judicial interpretations of the words, and Congress would have to have affirmatively rejected the exception to eliminate it from the "judicial glosses" carried by the "fair and equitable" phrase. 102 B.R. at 575 n. 20. This theory, however, ignores the fact Congress not only used the possible words of art "fair and equitable" but went on in § 1129(b)(2) to specify certain minimum requirements established by the phrase and defined a new version of the absolute priority rule for unsecured creditors in § 1129(b)(2)(B). This court views Congress' failure to include the exception in this new definition as the significant factor here rather than its failure to expressly repudiate the exception. See *Winters,* 99 B.R. at 663 (*"Congress, with apparent deliberation, did not mention the 'infusion of new capital' as a consideration in applying the fair and equitable test [under § 1129(b)]."*). Where Congress has defined the absolute priority rule in words that omit any exceptions, this court does not believe courts are authorized to accept plans which clearly violate that rule, as plans following the *Los Angeles Lumber* exception do.

The *Snyder* analysis offered two other apparent bases for concluding the exception still exists. First, the court noted the wording of § 1129(b)(2)(B)(ii) might indicate the exception remains viable. The statute forbids allowing the owners of the business to retain or receive any property "on account of" their interests where senior objecting creditors are to be paid less than their full claims; under *Los Angeles Lumber,* the argument goes, the owners retain their interests "on account of" their new capital contributions, not "on account of" their prior interests. This assertion has a superficial appeal but is incomplete. The only reason the owners might be allowed to

make such a contribution without competition from other would-be investors is "on account of" their prior interests. Second, the court suggested the exception is viable until eliminated by a higher court because nothing in the legislative history suggests Congress intended to eliminate the theory. However, as previously indicated, this court believes the *Winters* court accurately demonstrated the legislative history does show Congress rejected the *Los Angeles Lumber* exception. The House Report on the Code stated in part: "Only when the parties are unable to agree on a proper distribution of the value of the company does the bill establish a financial standard." H.R.Rep. No. 595, 95th Cong., 2d sess. 224, reprinted in 1978 U.S.Code Cong. & Ad.News 5963, 6184. That financial standard requires that any dissenting class of creditors be paid in full before any junior class receives or retains anything under the plan. § 1129(b)(2). The *Los Angeles Lumber* exception does not satisfy this requirement.

■ What is actually sought by the debtors under their plans and the *Los Angeles Lumber* exception is the right to buy the business without following § 363 or § 1123(a)(5)(D) and § 1129(a)(11), while using § 1129(b)(2)(A) cram down to force secured creditors to provide 100% loan-to-value financing for their collateral and ignoring the right to full payment granted to unsecured creditors under § 1129(b)(2)(B)(i). The *Greystone* court recognized the *Los Angeles Lumber* exception might be viewed as a sale of the business, but stated that the exception did not permit undermining the plan to search for the most plentiful source of cash to fund the plan. 102 B.R. at 577 n. 22. Unlike the *Greystone* court, this court is convinced the debtors must satisfy the claims of the rejecting unsecured class in full if they wish to proceed under their plans as drafted.

Finally, even under the pre-Code pre-*Ahlers Los Angeles Lumber* exception, the debtor must show that the funds contributed are necessary to the reorganization, not merely necessary to the debtor's retention of interest, that the contribution is substan-

tial and that it exceeds the value of the retained interest. The debtors in these cases have not carried their burden to establish this exception.

For these reasons, the debtors' plans may not be confirmed.

IT IS SO ORDERED.