In re Robert C. WINTERS, Debtor.

PENNBANK, Movant,

v.

Robert C. WINTERS, Respondent.

Bankruptcy No. 87–00472E.

Motion No. 88–751.

United States Bankruptcy Court,
W.D. Pennsylvania.

April 28, 1989.

Curtis Blystone, Meadville, Pa., for Pennbank.

David Hotchkiss, Meadville, Pa., for debtor/respondent.

## OPINION

WARREN W. BENTZ, Bankruptcy Judge.

This matter has come before this court on a motion filed by Pennbank seeking,

*inter alia,* relief from the automatic stay. In response to the motion, the debtor has submitted a proposed plan of reorganization under which the debtor intends to retain his equity interest in property of the estate, including, *inter alia,* the property which is subject to Pennbank's mortgage. The bank is undersecured. The issue is whether the debtor's proposed plan constitutes a sufficient response to Pennbank's motion; i.e., is the plan capable of confirmation and can it be "crammed down" over the objection of the bank.

## FACTS

The debtor is engaged in business as the owner of a commercial building which has one tenant, Win–Par, Inc. Debtor owns 50 percent of the stock of Win–Par, Inc., which operates a tavern and restaurant in the leased premises.

At the time Pennbank filed its motion, the total outstanding indebtedness to Pennbank was approximately $113,162.61 consisting of a principal sum of $104,612.61 plus accrued interest in excess of $7,000 and attorney's fees, costs and expenses in the approximate amount of $1,550. Pennbank's indebtedness was secured by a first mortgage on the debtor's commercial property. The loan was also seven months in arrears at the time Pennbank filed its motion. In addition, the property was subject to a first lien for three years of real estate taxes which were delinquent and unpaid in an approximate amount of $15,300. The debtor initially alleged that the property was worth at least $125,000. Thus, even if we assume the debtor's valuation was correct, Pennbank's claim was undersecured at the time the motion was filed by at least $3,462.61 ($125,000.00—$15,300—$113,162.61).

In his proposed plan of reorganization, the debtor now alleges that the value of the collateral securing the bank's debt is no longer in excess of $125,000, but rather is only $70,000. Assuming the validity of debtor's valuation, Pennbank has a secured claim of $54,700 ($70,000—$15,300) and an unsecured claim of $58,462.61. Even assuming that the commercial real estate is necessary for an effective reorganization, the debtor's proposed plan does not and cannot satisfy the absolute priority rule codified in § 1129(b). The debtor's plan would leave the bank with an unsecured claim of an amount that would be sufficient to enable the bank to block acceptance of the plan by the class of unsecured creditors. Pennbank has asserted its objection to the proposed plan.

According to the proofs of claims filed, a total of three unsecured creditors have filed claims which total only $18,377.55. Applying the valuation contained in the proposed plan, Pennbank would be the largest unsecured creditor with an unsecured claim of at least $58,462.61 ($70,000.00—$15,300—$113,162.61). Thus, Pennbank is the largest unsecured creditor and without its approval, the approval of the class of unsecured creditors cannot be obtained under § 1126(c) which requires acceptance by at least two-thirds in amount and more than one-half in number. The plan only proposes to pay unsecured creditors 15% while the debtor would retain significant property; i.e., the title to and future equity in the commercial property, as well as the debtor's ownership of 50% of the stock of Win–Par, Inc.

## DISCUSSION

We recently addressed a similar issue in *In re Sanford,* 97 B.R. 835 (Bankr.W.D.Pa. 1989). In that case, we applied § 1129(b)(2)(B) in holding that if a class of creditors is impaired under the plan, and object as a class, the debtor cannot receive or retain under the plan any property. A plan that provides otherwise must fail. Here, the debtor plans on retaining property in the proposed plan of reorganization.

Debtor's plan calls, in the alternative, for the infusion of new borrowed funds of $12,000. The $12,000 represents the value of the debtor's one-half ownership interest in Win–Par, Inc. Thus, the $12,000 "infused" is merely the liquidation of an asset of the estate (the Win–Par, Inc. stock). That cannot be viewed as an "infusion" of capital, except, perhaps, to the extent of the debtor's $4,150 exemption right therein.

Viewed in the light most favorable to the debtor, the $12,000 "infusion" is a contribution of $4,150. The debtor argues that his "infusion" of funds enables him to impose upon the non-consenting class of unsecured creditors his plan which would pay them 15% of the allowed claims. His best argument is the dicta in *Case v. Los Angeles Lumber Products Co.*, 308 U.S. 106, 60 S.Ct. 1, 84 L.Ed. 110 (1939), which states:

> It is, of course, clear that there are circumstances under which stockholders may participate in a plan of reorganization of an insolvent debtor....
>
> [W]e believe that to accord 'the creditor of his full right of priority against the corporate assets' where the debtor is insolvent, the stockholder's participation must be based on a contribution in money or money's worth, reasonably equivalent in view of all the circumstances to the participation of the stockholder. 308 U.S. at 121–122, 60 S.Ct. at 10–11.

■ We conclude, however, that the historical development of the Chapter 11 concept precludes acceptance of the debtor's proposition that by contributing value, whether by infusing new capital or by waiving exemption rights, he can force upon the non-consenting body of unsecured creditors a plan impairing their rights.

At common law, there was no recourse available to the distressed debtor-merchant except one of the forms of voluntary arrangement with his creditors. The arrangement was typically in the form of a general assignment for the benefit of creditors, an extension agreement, or a common law composition. These forms of arrangements were enforceable at common law, but the majority of creditors willing to scale down their claims or defer payment in whole or in part could not compel dissenting creditors to agree to a like change. The success of such an arrangement depended eventually upon the unanimous consent of all the substantial creditors involved. If one unhappy creditor had a claim of substance and refused to agree, that creditor could upset the whole scheme by attachment or other legal process to collect his claim in full. 6 *Collier on Bankruptcy* ¶ 0.02 (14th edition 1978). Thus, if the distressed debtor-merchant and all of his consenting creditors did not agree to a 100% payment to the dissenting creditor(s), the debtor-merchant would go out of business and the assets liquidated by a sheriff's levy and sale.

Under the Bankruptcy Act, there were two primary devices for achieving a reorganization. Of these two devices, one was similar to the common law composition with a distinct advantage: if the court confirmed the composition offered under § 12 of the Act, it could bind dissenting minority creditors. (Section 12 was replaced by Chapter XI in the Chandler Act of 1938, but its utility decreased with the advent of § 77B in 1934 [the predecessor to Chapter X] for use by ordinary corporate debtors).

The other device involved a procedure under the ordinary bankruptcy provisions whereby the reorganization was effected by the reorganizers' purchase of the bankrupt's assets at the bankruptcy sale. It was this procedure that led to the landmark decision of *Northern Pacific Railway Company v. Boyd*, 228 U.S. 482, 33 S.Ct. 554, 57 L.Ed. 931 (1913), which established the "absolute priority" rule. *Collier* provides an excellent discussion of the evolution of the "absolute priority" wherein it states:

> ... [I]n equity receivership reorganizations, the [absolute priority] rule, although affirmed by the Supreme Court, was in practical effect given something less than full application. Reorganizers preferred a less exacting doctrine and fostered what has been termed the "relative priority" rule. Accordingly, when former § 77B was enacted, the requirement of § 77B(f)(1) that a plan must be "fair and equitable" before it could be confirmed, since repeated in § 221(2) of Chapter X, was thought by some courts not to embody the absolute rule of the *Boyd* case but instead to permit the confirmation of a plan which recognized in only a relative and variable way the respective rights of creditors and stockholders and which sometimes amounted to no more than a composition among

creditors. Some courts thought that the [absolute priority] rule of the *Boyd* case at least could be relaxed where the debtor was solvent in the bankruptcy sense.

These notions were eventually dispelled by the Supreme Court. In *Case v. Los Angeles Lumber Products Co.*, 308 U.S. 106 [60 S.Ct. 1, 84 L.Ed. 110] (1939), the Court, speaking through Mr. Justice Douglas, said that "The words 'fair and equitable' as used in section 77B(f) are words of art which prior to the advent of section 77B had acquired a fixed meaning through judicial interpretation in the field of equity receivership reorganizations." It was pointed out that in equity reorganizations the rule of the *Boyd* case and related cases was "properly applied in passing on objections made by various classes of creditors that junior interests were improperly permitted to participate or were too liberally treated therein." In such cases the rule "was commonly included in the phrase 'fair and equitable' or its equivalent." Thus the words "fair and equitable" or the like, used by the courts to "include the 'fixed principle' of the *Boyd* case, its antecedents and its successors", firmly imbedded the [absolute priority] doctrine of the *Boyd* case in § 77B reorganizations. In *Consolidated Rock Products Co. v. DuBois*, 312 U.S. 510 [61 S.Ct. 675, 85 L.Ed. 982] (1941), Mr Justice Douglas, again, speaking for the Court, declared that the "full and absolute priority rule of *Northern Pacific Railway Co. v. Boyd* ... and *Case v. Los Angeles Lumber Products Co.*" applied in all reorganizations, whether the debtor was solvent or insolvent in either the bankruptcy or equity senses. He further emphasized that "that rule was not satisfied even though the 'relative priorities' of the creditors and stockholders were maintained." And in *Marine Harbor Properties, Inc. v. Manufacturer's Trust Co.*, 317 U.S. 78 [63 S.Ct. 93, 87 L.Ed. 64] (1942), Justice Douglas affirmed that the absolute priority rule "obtains under Chapter X as well as under its predecessor, § 77B."

It is settled, therefore, that the condition for both approval and confirmation stated in §§ 174 and 221(2) [of chapter X], that the plan must be "fair and equitable", incorporates without dilution the "absolute priority" rule, the "fixed principle", of the *Boyd* case. The question remains: what is the absolute priority rule, and how does it differ from the now rejected relative priority theory?

Under the absolute priority rule, a plan is not "fair and equitable" unless it provides participation for claims and interests in complete recognition of their strict priorities, and ... the value of the debtor's assets supports the extent of the participation afforded each class of claims or interests included in the plan. Any arrangement by which a junior class receives values allocable to a senior class "comes within judicial denunciation." Beginning with the topmost class of claims against the debtor, each class in descending rank must receive full and complete compensation for the rights surrendered before the next class below may properly participate. Thus the principle is applied as between senior and junior secured creditors, between secured and unsecured creditors, between unsecured creditors and stockholders, between different classes of stockholders, and, of course, between secured creditors as a whole and stockholders.... Where the debtor is insolvent, however, the courts have stressed the necessity for exceptional vigilance in order to prevent any possible diversion of the debtor's assets to the stockholders at the expense of creditors.

6A *Collier on Bankruptcy* ¶ 11.06 at 205–215 (14th edition 1978).

The drafters of the Bankruptcy Code of 1978 were well aware of the absolute priority rule, its exceptions and its applicability in the former Chapters VIII, X, XI and XII when the drafters consolidated the former chapters into the present Chapter 11. The legislative history contained in the House Report specifically addressed the codification of the "absolute priority" rule and the continued vitality of the exceptions, if

any, thereto. In a pertinent part, the House Report states:

Only when the parties are unable to agree on a proper distribution of the value of the company does the bill establish a financial standard. If the debtor is unable to obtain the consents of all classes of creditors and stockholders, then the court may confirm the plan anyway on the request of the plan's proponent, if the plan treats the nonconsenting classes fairly. The bill defines "fairly" in terms of the relative rights among the classes. Simply put, the bill requires that the plan pay any dissenting class in full before any class junior to the dissenter may be paid at all [proposed 11 U.S.C. § 1129(b)]. The rule is a partial application of the absolute priority rule now applied under chapter X and requires a full valuation of the debtor as the absolute priority does under current law. The important difference is that the bill permits senior classes to take less than full payment in order to expedite or insure the success of the reorganization.

H.R.Rep. No. 595, 95th Cong., 2d sess. 221–24, reprinted in 1978 U.S.Code Cong. & Ad.News 5963, 6181–84.

Similarly, the 15th edition of *Collier on Bankruptcy* describes the relationship between § 1129(b) and the absolute priority rule in the following manner:

Sections 1129(b)(2)(B) and 1129(b)(2)(C) contain the Code's modification of the Chapter X "fair and equitable" rule. Simply stated if a class of impaired unsecured claims or equity interests does not accept the plan, the plan must satisfy the absolute priority rule as to the dissident class and all junior classes. It is important to note that the application of the so-called "absolute priority rule applies only in cases when a class of unsecured claims or equity interests is impaired and does not accept the plan. In that event, the absolute priority rule does not apply to all classes of unsecured claims and equity interests, but only to the dissenting class and classes junior to the dissenting class. As the sponsors of Public Law No. 95–595 stated:

It must be emphasized that the fair and equitable requirement applies only with respect to dissenting classes. Therefore, unlike the fair and equitable rule contained in Chapter X and section 77 of the Bankruptcy Act, under section 1129(b)(2), senior accepting classes are permitted to give up value to junior classes as long as no dissenting intervening class receives less than the amount of its claims in full. If there is no dissenting intervening class and the only dissent is from a class junior to the class to which value has been given up, then the plan may still be fair and equitable with respect to the dissenting class, as long as no class senior to the dissenting class has received more than 100 percent of the amount of its claims.

5 *Collier on Bankruptcy* ¶ 1129.03[e] at 1129–56 to 1129–57 (15th edition 1979). *See also* 124 Cong.Rec. H11103–05 (daily ed. Sept. 28, 1978); S17420–22 (daily ed. Oct. 6, 1978) (remarks of Rep. Edwards and Sen. DeConcini).

We note that in *Case v. Los Angeles Lumber Products Co.*, 308 U.S. 106, 60 S.Ct. 1, 84 L.Ed. 110 (1939), the Supreme Court interpreted the confirmation standard in § 77B(f) to require that a plan had to be approved by the required percentages of each class of security holders *and* that the plan complied with the fair and equitable standard which embodied the absolute priority rule. Thus, under this interpretation, even though the requisite majority of a class accepted the plan, if a minority dissenting creditor within the accepting class objected, the court could not confirm a plan if the plan did not strictly comply with the absolute priority rule. However, the Bankruptcy Code of 1978 changed this confirmation standard.

Moreover, in *Norwest Bank v. Ahlers*, 485 U.S. 197, 108 S.Ct. 963, 99 L.Ed.2d 169 (1988), the Supreme Court cast doubt on whether the judicially created "infusion-of-money-or-money's-worth" exception to the absolute priority rule, stated in *Case v. Los Angeles Lumber Products Co.*, 308 U.S. at 121–22, 60 S.Ct. at 10–11, survived the enactment of the Code in 1978 and more

particularly § 1129(b). We are bound by the same reservations; nor will we permit such an exception in derogation of the express language of the Code.

■ In drafting Chapter 11, Congress embodied various portions of prior confirmation standards into 11 U.S.C. § 1129. Under the confirmation standard of § 1129(a), if the requisite majority (⅔ in amount and number as set out in § 1126) of creditors in each class have accepted the plan, then the plan need not comply with the absolute priority rule. The absolute priority rule is now applicable only when the proponent of the plan seeks to "cramdown" the plan under the alternative confirmation standard contained in § 1129(b) on a *class* that is impaired and has rejected the plan.

If the standard contained in § 1129 were applied to the facts of the *Los Angeles Lumber Products Co.*, the plan there would have been confirmed. This is so because under § 1129(a), if each class of creditors has accepted the plan (notwithstanding the minority dissent within the class), the plan will be confirmed if the other requirements of § 1129(a) are satisfied. The Code does not give the minority dissenting creditor a right to raise an objection based on the absolute priority rule which is contained in § 1129(b)(2).

Only after it is apparent that an impaired *class* objects is it necessary for the court to determine whether or not the plan is capable of confirmation under § 1129(b). In such a situation, the Code states that the plan may be confirmed if it "does not discriminate unfairly, and is fair and equitable with respect to each class of claims or interests that is impaired under, and has not accepted the plan." 11 U.S.C. § 1129(b)(1). However, Congress did not rely on "the words 'fair and equitable' as ... words of art which ... had acquired a fixed meaning through judicial interpretation." *See Los Angeles Lumber Products,*

308 U.S. at 115, 60 S.Ct. at 7. Rather, Congress specifically defined "the condition that a plan be fair and equitable with respect to a class" in § 1129(b)(2). In doing so, Congress changed the absolute priority rule so that it now applies only to each class as a whole, and not to minority dissenters within a class. Congress, with apparent deliberation, did not mention the "infusion of new capital" as a consideration in applying the fair and equitable test. Thus, the discussion in *Los Angeles Lumber Products Co.* about "infusion of new capital" is no longer an element to be considered in the "fair and equitable" issue for confirmation under 11 U.S.C. § 1129(b)(2)(B).

We note that § 1129(b)(2) provides that "fair and equitable with respect to a class *includes*" the requirements discussed above. Other requirements are left to further development. But the requirements discussed above are the minimum mandatory requirements; only after the absolute priority rule is satisfied—on a class basis and not on an individual basis—may it be considered whether additional requirements are necessary under § 1129(b)(2).

■ Therefore, we hold that there is no exception ("infusion of new capital" or otherwise) permitted under 11 U.S.C. § 1129(b).[1]

There is also another reason why the debtor's plan could not be confirmed. The debtor argues that it can satisfy the requirements of § 1129(a)(10), which requires that at least one class of impaired claims accept the plan, by obtaining acceptance from impaired priority tax creditors. Although we assumed above that the debtor would have obtained the acceptance of an impaired class other than the unsecured creditor class, we fail to see how the priority tax creditors can be an impaired class for purposes of § 1129(a)(10). If the priority tax creditors agree to a treatment other

---

**1.** We do not address here the special problems of railroad reorganizations. *See* 11 U.S.C. §§ 1165 and 1173 (Confirmation is subject to a "best interests" test. We do note that the "best interest of creditors" test was utilized in the former Chapter XI to accommodate the reten-

tion of any equity interest even though creditors were scaled down in a composition). Also, Chapter 12 and Chapter 13 involve considerations and rules not applicable here. *See* 11 U.S.C. §§ 1225 and 1325.

than what they are entitled to, they are not impaired. Similarly, if the priority tax creditors are paid in full as required by § 1129(a)(9)(C), then they are also not impaired. In either situation, the priority tax creditors are conclusively presumed to have accepted the plan because the claims are not impaired. See 11 U.S.C. § 1126(f).

CONCLUSION

We conclude that a plan may be confirmed under 11 U.S.C. § 1129(a) whether or not a senior class of creditors give up some value to a junior class of creditors, but, under § 1129(b), if any class of creditors is impaired and objects as a class, the plan can not be confirmed unless it complies with the absolute priority rule—a class junior to the dissenting class may not receive or retain any property until the claims of the dissenting class are paid in full.

Therefore, because the debtor will be unable to propose a feasible plan of reorganization capable of confirmation, we shall grant the bank's motion for relief from stay. A separate order will be issued in accordance with the foregoing.