In re **WOODSCAPE LIMITED PARTNERSHIP**, Debtor.

The **PENN MUTUAL LIFE INSURANCE COMPANY**, Movant,

v.

**WOODSCAPE LIMITED PARTNERSHIP**, Respondent.

**BALCOR PENSION INVESTORS VI**, Movant,

v.

**WOODSCAPE LIMITED PARTNERSHIP**, Respondent.

Bankruptcy Nos. 90–4–3559–SD. Motion Nos. 91M–2072– SD, 91M–1966–SD.

United States Bankruptcy Court, D. Maryland, at Rockville.

Dec. 9, 1991.

Tammy G. Cohen, Stephen E. Leach, Katherine J. Lichtmann, Washington, D.C., for debtor.

Theresa Hajost, Washington, D.C., for The Penn Mut. Life Ins. Co.

Emil Hirsch, Washington, D.C., for Balcor Pension Investors VI.

## MEMORANDUM OPINION DENYING MOTIONS FOR RELIEF FROM STAY

E. STEPHEN DERBY, Bankruptcy Judge.

In this single real estate asset case, the pending motions for relief from stay raise the question whether Debtor's proposed plan of reorganization violates the absolute priority rule as a matter of law. The undersecured holder of a second, wrap-around deed of trust on Debtor's apartment project asserts that there is no new value exception to the absolute priority rule and, alternatively, that the fair and equitable standard is otherwise violated by the possibility of distributions on new value contributions. The factual scenario is not atypical of single asset real estate reorganization cases which raise philosophical questions about the intended purpose of reorganization, particularly when the collateralized, primary lender is undersecured and no equity exists in the real estate asset.

### I. Facts.

The Debtor is a Maryland limited partnership with 64 individual limited partners. It operates a 240 unit, luxury residential apartment complex in Raleigh, North Carolina known as the Woodscape Apartments, as its sole operating asset.

The Woodscape Apartments are subject to a first deed of trust in favor of The Penn Mutual Life Insurance Company ("Penn Mutual") to secure an outstanding balance slightly in excess of $3.8 million. It is also encumbered by a second wrap-around deed of trust in favor of Balcor Pension Investors VI ("Balcor") with an outstanding balance of approximately $8.1 million, including the amount owed to Penn Mutual. Further, there are approximately $102,000 in prepetition real estate taxes outstanding.

At the time of the hearing, the parties stipulated that Debtor's appraisal fixed the fair market value of the Woodscape Apartments at $5.6 million, while Balcor's fair market appraisal was $6.5 million. Since the hearing on these motions, the court has conducted a valuation hearing and fixed the fair market value at $6.1 million. Regardless, Penn Mutual is an oversecured creditor and Balcor is an undersecured creditor. The significance of this distinction is that Penn Mutual is entitled at this juncture to interest and costs pursuant to its loan documents, while Balcor is not. 11 U.S.C. § 506(b); *United Savings Ass'n v. Timbers of Inwood Forest Assocs.*, 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988). To provide Balcor with adequate protection of its undersecured position, the court previously entered an order requiring the Debtor to make the regular monthly installment payments due to Penn Mutual under the promissory note secured by its first lien and to pay all real estate taxes accruing postpetition. Debtor has complied with this order to date.

Debtor has proposed a plan of reorganization, and a hearing has been held on Debtor's disclosure statement at which the court granted leave to amend. Under Debtor's proposed plan, Penn Mutual will be paid interest monthly at its ten percent per annum contract rate, and it will retain its first lien. Debtor does not propose to cure its arrearage to Penn Mutual on the effective date of the plan. Rather, Debtor commits either to refinance or to sell Woodscape Apartments and pay Penn Mutual in full after three years, but not later than ten years, from confirmation of its plan, failing which it will surrender the property.

Further, Debtor maintains that ten percent is also the fair market rate of interest.

Balcor is allowed a secured claim of approximately $1.9 million under the proposed plan. This amount must now be increased somewhat as the result of the valuation hearing. Its claim is to be paid in full at the same time as the Penn Mutual claim at a promised overall yield of 12%. Balcor is promised deferred cash payments in equal monthly installments with interest at a pay rate of 10.5%. The balance of Balcor's claim would be treated as unsecured and placed in a separate class by itself. Balcor's unsecured claim would also be paid in full at the end of ten years, or the earlier sale or refinancing of the property. Beginning after three years, interest would be paid monthly on a scale increasing from seven to nine percent per annum. Other unsecured trade debt would be paid in full without interest over 90 days after confirmation in equal monthly installments.

Debtor's partners have been solicited for capital contributions, and the Debtor has committed its partners to invest at least $150,000 of new capital. If a partner does not make the new investment, the partner's interest will be extinguished. Excess cash flow, after making all plan payments that are due, will be available for distributions to partners who have retained their interests by making the required new investment of capital. A third party investor has been identified who will invest $60,000 in conjunction with the general partner to cover the shares of existing partners who elect not to make an additional contribution of new capital.

## II. Issues.

Balcor advances three arguments why Debtor's plan is not confirmable as a matter of law and therefore relief should be granted under 11 U.S.C. § 362(d)(2):

1. There is no exception for new value to the absolute priority rule under 11 U.S.C. § 1129(b)(2)(B);

2. The proposed plan is otherwise not fair and equitable to Balcor because the plan would allow distributions to limited

partner investors from excess cash flow prior to payment of Balcor's unsecured claim in full; and

3. Debtor's solicitation for investment in the plan violates Section 12(2) of the Securities Act of 1933.

Other fact specific and time variable issues raised by Balcor in objecting to Debtor's plan, such as the required interest rate for deferred cash payments on secured claims and feasibility, have been deferred until there is a confirmation hearing, if there is one. *See In re Ledgemere Land Corp.*, 125 B.R. 58 (Bankr.D.Mass.1991); *In re Northgate Terrace Apartments, Ltd.*, 126 B.R. 520 (Bankr.S.D.Ohio 1991).

### III. *Analysis.*

▆▆▆ Since Debtor does not have equity in the property, the remaining issue under 11 U.S.C. § 362(d)(2) is whether the Woodscape Apartments are necessary for an effective reorganization by Debtor. *United Savings Ass'n v. Timbers of Inwood Forest Assocs.*, 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988). "What this requires is not merely a showing that if there is conceivably to be an effective reorganization, this property will be needed for it; but that the property is essential for an effective reorganization *that is in prospect.*" *Timbers*, 484 U.S. at 375–76, 108 S.Ct. at 632. (Emphasis in original). Further, it must be established that there is " 'a reasonable possibility of a successful reorganization within a reasonable time.' " *Id.* Preliminarily, since this case involves a single asset of real property, there exists no possibility of reorganization for Debtor without it.

### A.

### *The New Value Exception to the Absolute Priority Rule.*

▆▆▆ The term "new value exception" is a misnomer. There is simply no new value exception to the absolute priority rule set out in Section 1129(b)(2)(B) of the Bankruptcy Code. 11 U.S.C. § 1129(b)(2)(B). Likewise, there was no new value exception codified in the former Bankruptcy Act.

Rather, there has been an acknowledgement by courts that it is possible for new equity to be invested in a reorganizing enterprise. One recognized source of that new investment of equity, and in fact a natural source for new equity capital, is from among pre-reorganization owners. However, to avoid a sham which would infringe upon the rights of creditors to a debtor's property values, and would thus violate the absolute priority rule, new investment must be needed and substantial, and it must be in money or money's worth.

Balcor posits that *Case v. Los Angeles Lumber Products Co., Ltd.*, 308 U.S. 106, 60 S.Ct. 1, 84 L.Ed. 110 (1939), the decision which often is cited as recognizing a new value exception, was decided under the Bankruptcy Act. Unlike the Code, the Act did not codify a definition for fair and equitable. Consequently, Balcor argues that the term retained its common law meaning under the Act, and the doctrine protected individual creditors, as opposed to classes of creditors. Balcor urges this court to follow cases which have expounded on this point of reason and have found the new value exception inapplicable under the Code..

The court disagrees with Balcor's position. Equity interest holders may contribute new capital of money or money's worth in exchange for participation in a plan of reorganization under Chapter 11 of the Bankruptcy Code, provided that full allowance has been accorded to the value of creditors' claims against a debtor's property interests. The core issue is not whether a new value exception has survived under the Bankruptcy Code. Rather, the core issue, recognizing that risks of valuation should be borne by the debtor and not the creditors, is on what terms equity interest holders may be allowed to participate in a plan of reorganization where a class of unsecured creditors will not be paid the full present value of its claims. The assertions made by Balcor, and the rationale underlying this court's contrary conclusions, require inquiry into the history and purpose of the absolute priority rule and its so-called new value exception.

1. *"Fair and Equitable" Standard In Equity Receivership.*

The absolute priority rule and the "fair and equitable" standard arose out of equity receivership cases. *Railroad Co. v. Howard,* 7 Wall. 392, 19 L.Ed. 117 (1868); *Louisville Trust Co. v. Louisville, Ry. Co.,* 174 U.S. 674, 19 S.Ct. 827, 43 L.Ed. 1130 (1899); *Northern Pacific Ry. Co. v. Boyd,* 228 U.S. 482, 33 S.Ct. 554, 57 L.Ed. 931 (1913); *Kansas City Terminal Ry. Co. v. Central Union Trust Co.,* 271 U.S. 445, 46 S.Ct. 549, 70 L.Ed. 1028 (1926).

In *Louisville Trust Co.,* the Supreme Court established the principle that "any arrangement of the parties by which the subordinate rights and interests of the stockholders are attempted to be secured at the expense of the prior rights of either class of creditors comes within judicial denunciation." *Louisville Trust Co. v. Louisville, Ry.,* 174 U.S. at 684, 19 S.Ct. at 830. This principle was built upon and affirmed by the Court in 1913 in *Northern Pacific Ry. Co. v. Boyd, supra,* where the Court illustrated the position more broadly:

> They [stockholders] were in the position of insolvent debtors who could not reserve an interest as against the creditors. Their original contribution to the capital stock was subject to the payment of debts. The property was a trust fund charged primarily with the payment of corporate liabilities. Any device, whether by private contract or judicial sale under consent decree, whereby stockholders were preferred before the creditor was invalid.

228 U.S. at 504, 33 S.Ct. at 560. Further, "such a transfer by stockholders from themselves to themselves cannot defeat the claim of a non-assenting creditor." *Id.* at 502, 33 S.Ct. at 559.

This fixed principle of equity reorganization was addressed again in *Kansas City Terminal Ry. Co., supra,* which held that "to the extent of their debts creditors are entitled to priority over stockholders against all the property of an insolvent corporation." 271 U.S. at 455, 46 S.Ct. at 551–552.

The fair and equitable absolute priority rule, however, did not foreclose new investment by old stockholders, or even require a cash payoff of creditors. As explained in the *Kansas City Terminal Ry. Co. v. Central Union Tr. Co.* opinion:

> But it does not follow [from the absolute priority rule] that in every reorganization the securities offered to general creditors must be superior in rank or grade to any which stockholders may obtain. It is not impossible to accord to the creditor his superior rights in other ways. Generally, additional funds will be essential to the success of the undertaking, and it may be impossible to obtain them unless the stockholders are permitted to contribute and retain an interest sufficiently valuable to move them. In such or similar cases the chancellor may exercise an informed discretion concerning the practical adjustment of the several rights.

271 U.S. at 455, 46 S.Ct. at 551–552. See also *Northern Pacific Ry. Co. v. Boyd,* 228 U.S. at 511, 33 S.Ct. at 562–563 (Dissenting opinion by Lurton, J., in which the Chief Justice and Justices Holmes and Van Devanter joined). ("Nor do I agree that every plan of reorganization which in any way includes stockholders of the reorganized company is for that reason alone to be regarded as an illegal withholding from creditors of corporate property which should go to the payment of corporate debts.").

2. *"Fair and Equitable" under the Bankruptcy Act and the New Value Contribution.*

The meaningful integration of the fair and equitable principle to corporate reorganization under the Bankruptcy Act commenced with *Case v. Los Angeles Lumber Products Co., Ltd.,* 308 U.S. 106, 60 S.Ct. 1, 84 L.Ed. 110 (1939). In *Los Angeles Lumber,* the Court determined that " 'fair and equitable' as used in § 77B(f) are words of art which prior to the advent of § 77B had acquired a fixed meaning through judicial interpretations in the field

of equity receivership reorganizations." [1] *Id.* at 115, 60 S.Ct. at 7. Moreover,

> At the outset it should be stated that where a plan is not fair and equitable as a matter of law it cannot be approved by the court even though the percentage of the various classes of security holders required by § 77B(f) for confirmation of the plan has consented. It is clear from a reading of § 77B(f) that the Congress has required both that the required percentages of each class of security holders approve the plan and that the plan be found to be "fair and equitable." The former is not a substitute for the latter.

*Id.* at 114, 60 S.Ct. at 6.

However, the *Los Angeles Lumber* Court cautioned that the test of "fair and equitable" treatment should not require blind, absolute priority status to dissenting creditors under the equity receivership case law.

> In application of this rule of full or absolute priority this Court recognized certain practical considerations and made it clear that such rule did not "require the impossible and make it necessary to pay an unsecured creditor in cash as a condition of stockholders retaining an interest in the reorganized company. His interest can be preserved by the issuance, on equitable terms, of income bonds or preferred stock." *Northern Pacific Ry. Co. v. Boyd, supra* [228 U.S. at], p. 508 [33 S.Ct. at pp. 561–562].... And it also recognized the necessity at times of permitting the inclusion of stockholders on payment of contributions, even though the debtor company was insolvent. As stated in *Kansas City Terminal Ry. Co. v. Central Union Trust Co., supra* [271 U.S. at], p. 455 [46 S.Ct. at p. 552]: "Generally, additional funds will be essential to the success of the undertaking, and it may be impossible to obtain them unless stockholders are permitted to contribute and retain an interest sufficiently valuable to move them. In such or similar cases the chancellor may exercise an in-

formed discretion concerning the practical adjustment of the several rights."

*Id.* 308 U.S. at 117, 60 S.Ct. at 8.

Accordingly, *Los Angeles Lumber* concluded that under the traditional meaning of "fair and equitable," as applied to bankruptcy reorganization, "stockholders may participate in a plan of reorganization of an insolvent debtor.... [w]here that necessity exists [for new money essential to the success of the undertaking] and the old stockholders make a fresh contribution and receive in return a participation reasonably equivalent to their contribution,...." *Id.* at 121, 60 S.Ct. at 10. This new value must be "a contribution in money or money's worth, reasonably equivalent in view of all the circumstances to the participation of the stockholder." *Id.* at 122, 60 S.Ct. at 10. The proposition was introduced as a separate doctrine, and not as an exception to fair and equitable absolute priority rule.

> It is, of course, clear that there are circumstances under which stockholders may participate in a plan of reorganization of an insolvent debtor.

*Id.* at 121, 60 S.Ct. at 10. In *Los Angeles Lumber*, however, the court denied confirmation because the new value to be contributed by shareholders was merely a pledge of " 'their financial standing and influence in the community' " and their " 'continuity of management,' " and it was not money or money's worth. *Id.*

### 3. *Effect of the Bankruptcy Code on the "Fair and Equitable" Standard under the Act.*

Under Chapter 11 of the Bankruptcy Code of 1978, a reorganization plan to be confirmed must meet the requisites of 11 U.S.C. § 1129. If all requirements of Section 1129(a) have been satisfied except that an impaired class has not accepted a plan, Section 1129(b) provides that the plan shall be confirmed by cramdown "if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of

---

**1.** Section 77B(f)(1) provided in relevant part that "[a]fter hearing such objections as may be made to the plan, the judge shall confirm the plan if satisfied that (1) it is fair and equitable

*and* does not discriminate unfairly in favor of any class or creditors or stockholders, and is feasible." (Emphasis supplied).

claims or interests that is impaired under, and has not accepted, the plan." 11 U.S.C. § 1129(b)(1). In defining fair and equitable treatment for a class of unsecured claims, the Code contains an absolute priority rule which provides that unless each claimant in such class receives or retains property with a present value equal to the allowed amount of their unsecured claim, "the holder of any claim or interest that is junior to the claims of *such [unsecured] class* will not receive or retain under the plan *on account of such junior claim or interest* any property." 11 U.S.C. § 1129(b)(2)(B)(ii) (Emphasis supplied).

Balcor argues the effect of this codification of a fair and equitable standard is to negate the doctrine recognized in *Los Angeles Lumber* which allows new value to be exchanged for the right of continued equity participation in an enterprise. It is argued that since fair and equitable traditionally applied only to impaired creditors, and not classes, the enactment of the Code statutorily revokes the previous definition.

The distinction between a dissenting creditor and a dissenting class does not have a substantive impact on whether the new value doctrine was abolished by the Bankruptcy Code. The legislative history to Section 1129(b)(2)(B)(ii) does not comment on this issue. In this case, Balcor's distinction creates no difference whatsoever as to its rights. Balcor, as an undersecured creditor, is Class 7 under the proposed plan. Whether the fair and equitable rule is applied to Balcor as an impaired creditor or an impaired class is a distinction without substance. Balcor retains the right to vote against the plan as proposed, and it carries the conclusive weight of its class because by definition it holds at least two-thirds in amount and one half in number of allowed claims voting in the class. 11 U.S.C. § 1126(c).

■ Notwithstanding, the court must address the competing case law on whether the Bankruptcy Code was intended to revoke the new contribution embellishment on the fair and equitable doctrine as it was recognized under the Bankruptcy Act. Absent an express and contrary statement of congressional intent in the plain meaning of the statutory language or otherwise, the presumption is that Congress did not intend to change prior judicial interpretation. As stated by the Supreme Court, "[t]he normal rule of statutory construction is that if Congress intends for legislation to change the interpretation of a judicially created concept, it makes that intent specific." *Midlantic Nat'l Bank v. New Jersey Dep't of Environmental Protection*, 474 U.S. 494, 501, 106 S.Ct. 755, 759, 88 L.Ed.2d 859 (1986). *See United Savings Ass'n. v. Timbers of Inwood Forest Assocs.*, 484 U.S. at 380, 108 S.Ct. at 634–635.

The analysis begins with the case of *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 108 S.Ct. 963, 99 L.Ed.2d 169 (1988), cited by both Debtor and Balcor for different purposes. In *Ahlers*, family farmer debtors proposed a Chapter 11 plan of reorganization which permitted them to retain an interest in their farm in consideration for "labor, experience and expertise" as new value. *Id.* at 199, 108 S.Ct. at 966. Debtors asserted that the new value theory should permit such a retention in exchange for a promise of future labor. *Id.* at 199–205, 108 S.Ct. at 966–968. Debtors also contended that the absolute priority rule was wholly inapplicable because the plan valued the Debtors' "sweat" equity at zero, and consequently no property was being retained by the junior class to the detriment of unsecured creditors. *Id.* at 207, 108 S.Ct. at 968–969.

The Court rejected both arguments of debtors because neither conceptually fit within the theory of new value as articulated in *Los Angeles Lumber*. As to the first proposition, the Court noted that "Los Angeles Lumber itself rejected an analogous proposition, finding that the promise of the existing shareholders to pledge their 'financial standing and influence in the community' and their 'continuity of management' to the reorganized enterprise was '[in]adequate consideration' that could not possibly be deemed 'moneys worth.'" *Id.* at 204, 108 S.Ct. at 967. As to the latter, the Court found it inconsistent to claim that an interest retained has zero

value, but assert that a retention of that interest entitles the holder to future profits generated. *Id.* at 208–09, 108 S.Ct. at 969–970. The question which the Supreme Court expressly did not address in *Ahlers*, despite urging by the Solicitor General that the Court hold it had been dropped by Congress, was whether the new value exception, upon a proper money or money's worth investment, still existed.

We need not reach this question to resolve the instant dispute. As we discuss *infra*, [485 U.S. at 967–968, 108 S.Ct.] at 204–206, 99 L.Ed.2d, at 178–179, we think it clear that even if the Los Angeles Lumber exception to the absolute priority rule has survived enactment of the Bankruptcy Code, this exception does not encompass respondents' promise to contribute their "labor, experience, and expertise" to the reorganized enterprise.

*Thus, our decision today should not be taken as any comment on the continuing vitality of the Los Angeles Lumber exception*—a question which has divided the lower courts since passage of the Code in 1978.

*Id.* at 203, n. 3, 108 S.Ct. at 967, n. 3. (Emphasis supplied).

### (i)

In the absence of a controlling directive on the issue, both Balcor and Debtor cite various cases to support the proposition that the so-called exception either has been nullified or still exists. Balcor draws attention to several recent cases for the conclusion that the new value theory no longer applies under the Code. *In re Outlook/Century, Ltd.*, 127 B.R. 650 (Bankr. N.D.Cal.1991); *In re Lumber Exchange Ltd. Partnership*, 125 B.R. 1000 (Bankr. D.Minn.1991); *In re Drimmel*, 108 B.R. 284 (Bankr.D.Kan.1989); *In re Winters*, 99 B.R. 658 (Bankr.W.D.Pa.1989); *In re Sanford*, 97 B.R. 835 (Bankr.W.D.Pa.1989); *Kham & Nate's Shoes No. 2 v. First Bank of Whiting*, 908 F.2d 1351 (7th Cir.1990); *Piedmont Associates v. Cigna*, 132 B.R. 75 (N.D.Ga., 1991).

These case authorities are not dispositive. First, each case cited by Balcor found that even if the new value exception existed, the plan was inadequate on the facts presented. *Winters* involved an individual debtor who proposed to infuse cash into the plan by liquidating an asset of the estate. In *Drimmel*, two individuals proposed to trade their future earnings for the right to participate in the plan, a position rejected by *Ahlers, supra*. *Lumber Exchange* determined the classification of claims was excessively disproportionate and therefore concluded that "even if the exception applied, or the *Code* otherwise accommodated the concept of new cash contribution, the plan proposed by the Debtor could not be confirmed as fair and equitable to the rejecting class in this case." 125 B.R. at 1008. In *Outlook/Century, Ltd.*, the debtor attempted to retain an insolvent partnership interest and call it worthless. "The Supreme Court has squarely rejected the argument that an interest in an insolvent business is not property under Section 1129(b)(2)(B)(ii)." 127 B.R. at 653. In *Kham & Nate's Shoes*, stockholders pledged their willingness to guaranty a corporate loan. "Bank asks us to hold that the new value exception vanished in 1978. We stop short of the precipice, as the Supreme Court did in *Ahlers*, ... first, the consideration for the shares is insufficient even if the new value exception retains vitality; ...." 908 F.2d at 1362. *Piedmont* found that "even assuming the new value exception exists, this court does not believe that Piedmont's reorganization plan meets the requirements of the exception", because the effect of the plan was to sell debtor's property to new owners. 132 B.R. at 79. *Sanford* addressed a proposed retention of property of the estate without even an expressed intent to contribute to the plan by the debtor and therefore failed even to raise the issue of a new value exception.

Second, although each of the preceding cases relied upon by Balcor failed, quite accurately, to find a statutory exception to the absolute priority rule for new value, neither did any case find a specific statutory prohibition against contributions of new equity, whether from a third party or

from a former owner. One reason is that the statutory language of the Bankruptcy Act was never the source of the so-called new value exception to the absolute priority rule. Likewise, the statutory language of the absolute priority rule in § 1129(b)(2)(B) of the Bankruptcy Code does not address new value contributions.

■ The allowance of new value contributions by equity holders was a doctrine developed originally outside of the Bankruptcy Act under equity receivership cases. *E.g., Kansas City Terminal Ry. Co.,* 271 U.S. at 455, 46 S.Ct. at 551. As an independent and extrastatutory doctrine, it is to be presumed that Congress would have expressly codified a rejection of the doctrine if it had intended its elimination. *Midlantic Nat'l Bank,* 474 U.S. at 501, 106 S.Ct. at 759. Instead, as recognized by the Supreme Court in *Ahlers,* Congress rejected a proposed amendment to liberalize the absolute priority rule to include continued management or other participation beyond money or money's worth, but it did not go further to reject the existing doctrine permitting contributions of new value in money or money's worth. *Ahlers,* 485 U.S. at 205, 108 S.Ct. at 967, *citing* H.R. Doc. No. 93–137, pt 1, pp. 258–259 (1973).

Third, each of the cases put forward by Balcor characterized its inquiry as whether there was an exception to the absolute priority rule. Such a focus is both too literal and too narrow. It both mischaracterizes the doctrine recognized in *Los Angeles Lumber* and dictates its own result, because a statutory exception does not exist. A more accurate characterization is that the contribution of new capital in money or money's worth, in return for a future participation in an enterprise which is reasonably equivalent to the contribution, simply does not violate the absolute priority rule. However, where former equity holders, a natural source of new capital, make the new investment, the contribution must be in money or money's worth because creditors are entitled to the present value of all property of an insolvent debtor before stockholders may participate. See *Kansas City Terminal Ry. Co. v. Central Union*

*Trust Co.,* 271 U.S. at 454–55, 46 S.Ct. at 551; *Case v. Los Angeles Lumber Products Co., Ltd.,* 308 U.S. at 117, 119–122, 60 S.Ct. at 8, 9–10. As stated in *Ahlers:* "Unlike 'money or money's worth,' a promise of future services cannot be exchanged in any market for something of value to the creditors *today.*" *Norwest Bank Worthington v. Ahlers,* 485 U.S. at 204, 108 S.Ct. at 967. (Emphasis the Court's).

(ii)

Debtor cites an array of lower court opinions to support its position that the new value option still exists. *In re Guilford Telecasters, Inc.,* 128 B.R. 622 (Bankr. M.D.N.C.1991); *Phoenix Mutual Life Insurance Company v. Greystone III Joint Venture (In the Matter of Greystone Joint Venture ),* 102 B.R. 560 (Bankr.W.D.Tex. 1989), *aff'd,* 127 B.R. 138 (W.D.Tex.1990), reversed and remanded, 948 F.2d 134 (5th Cir.1991); *In re 222 Liberty Associates,* 108 B.R. 971 (Bankr.E.D.Pa.1990); *In re Green,* 98 B.R. 981 (9th Cir.BAP 1989); *Matter of Yasparro,* 100 B.R. 91 (Bankr. M.D.Fla.1989); *In re Snyder,* 105 B.R. 898 (Bankr.C.D.Ill.1989); *In re Sherwood Square Associates,* 107 B.R. 872 (Bankr. D.Md.1989).

To the extent the case authorities relied upon by Debtor find a new value exception to the absolute priority rule of 11 U.S.C. § 1129(b)(2)(B), the court does not adopt the characterization as substantive. The infusion of new value in money or money's worth from sources which are not property of the estate, even if from an equity holder, is an independent act which is not *per se* a violation of the absolute priority rule. Such an infusion of new value does not constitute a distribution of property values of the estate to unsecured creditors before equity interest holders. A new contribution must be independently justified as adequate, and there is thus no need for an exception to the absolute priority rule. There is only a need, particularly where the contribution is from holders of equity interests in an insolvent entity that would otherwise be extinguished, to be assured that the new value is real, *i.e.* "a contribution in money or in money's worth, reasonably

equivalent in view of all the circumstances to the participation of the stockholder." *Case v. Los Angeles Lumber Products Co.*, 308 U.S. at 122, 60 S.Ct. at 10.

This principle was implicitly recognized by the Supreme Court in *Ahlers* when it rejected the promise of future labor, experience and expertise as inadequate to satisfy the new value requirement, because unlike money's worth, a promise of future services could not be exchanged for present value to creditors. *Norwest Bank Worthington v. Ahlers*, 485 U.S. at 204, 108 S.Ct. at 967. The principle is also inherent in the Court's rejection of the argument in *Ahlers* that the right to future participation in a debtor's enterprise, even where the debtor is insolvent, has no value. *Id.* at 207–209, 108 S.Ct. at 968–969. The Court recognized that the right to future profits and control, *i.e.* the going concern value of the enterprise, is intangible property of the estate in which creditors are entitled to share under the absolute priority rule. *Id.* Consequently, the new value exchanged for future participation cannot be merely a promise, but must be fair value in money or money's worth which has a "place in the asset column of the balance sheet of the new company." *Case v. Los Angeles Lumber Products Co., Ltd.*, 308 U.S. at 122–123, 60 S.Ct. at 10–11. See also *Norwest Bank Worthington v. Ahlers*, 485 U.S. at 204, 108 S.Ct. at 967.

■ As property of the estate, the right to future participation in a debtor's enterprise may be sold. 11 U.S.C. § 363. It may be sold pursuant to a plan of reorganization. *Id.* at § 1123(a)(5)(D). There is no prohibition against a private sale or against a sale to insiders; and there is no requirement that the sale be by public auction. Rather, for a plan of reorganization to be confirmed, it is the statutory requirements of 11 U.S.C. § 1129 which must be satisfied. The debtor is presumptively in control of the enterprise as debtor-in-possession, and a debtor initially has the right to move forward exclusively in control of plan confirmation. 11 U.S.C. §§ 1107, 1108, 1121. The rights of creditors are protected in numerous ways, including by example

the right to receive under a plan present value not less than the creditor would receive in a Chapter 7 liquidation, and the right of secured creditors to adequate protection of their collateral and to receive under a plan the present value of their claims on a secured basis. *Id.* at §§ 1129(a)(7)(A)(ii), 362(d)(1) and 363(e), and 1129(b)(2)(A). However, the secured claim of a creditor is limited to the value of the creditor's collateral; and the undersecured creditor is not entitled to preconfirmation interest on its claim or to relief from stay when the collateral is necessary for an effective reorganization reasonably in prospect. *Id.* at § 506(a) and (b); *United Savings Ass'n. v. Timbers of Inwood Forest Assocs.*, 484 U.S. at 371–376, 108 S.Ct. at 630–632.

The right of a debtor to some control over its rehabilitation in bankruptcy is of recent origin. Based on their English predecessors, bankruptcy acts of the United States until recently have been creditor oriented. See 34 & 35 Henry VIII, Ch. 4 (1542–43); 4 Anne, Ch. 17 (1705). The United States bankruptcy acts offered a discharge to a debtor upon application only as an inducement in exchange for the debtor's cooperation with creditors in a successful liquidation. 2 Stat. 19 (1800), repealed 2 Stat. 248 (1803); 5 Stat. 440 (1841), repealed 5 Stat. 614 (1843); 14 Stat. 517 (1867), repealed 20 Stat. 99 (1878); 30 Stat. 544 (1898). It was not until enactment of the Chandler Act in 1938 that a debtor's discharge was made automatic absent objection. 52 Stat. 840 (1938). Even the rehabilitation chapters under the Chandler Act were self-limiting for debtors. Chapter X reorganizations applied only to corporate debtors and generally required appointment of a trustee. An arrangement under Chapter XI could settle or extend only unsecured debt, and Chapter XII real estate plans required a two-thirds vote of creditors. The Bankruptcy Code effected a fundamental philosophical change by giving a debtor, initially, exclusive control of its reorganization, by combining elements of Chapters X, XI and XII of the Act into a unified Chapter 11 reorganization, and by eliminating barriers to confirmation of a

debtor's plan. Pub.L. No. 95–598 (1978), as amended. *E.g.*, 11 U.S.C. § 1126(c) (acceptance or rejection of a plan by a creditor class is determined only from votes cast) and § 1129(b) (cramdown option under certain circumstances).

Allowing new value to be infused into a reorganized debtor by equity holders in exchange for continued participation also responds to the need for a motivated party to be responsible for a debtor's operation and for proposing a reorganization plan. An equity owner is a natural and most common source for such leadership, but an owner would not likely be motivated without the possibility for continued participation. There is no requirement that a debtor be solvent to seek relief under a Chapter 11 reorganization. See 11 U.S.C. §§ 109(b) and (d). Therefore, it is desirable for ownership to have the possibility of future participation in return for a fair contribution of money or money's worth. This possibility is particularly compelling for individuals, whose right to seek relief under Chapter 11 has been recognized. *Toibb v. Radloff*, — U.S. —, 111 S.Ct. 2197, 115 L.Ed.2d 145 (1991). See *In re Green*, 934 F.2d 568, 573 n. 8 (4th Cir.1991).

The recent decision of *Phoenix Mutual Life Ins. Co. v. Greystone III Joint Venture*, 948 F.2d 134 (5th Cir. (Tex.) 1991) reversed confirmation of debtor's plan because of improper classification of an undersecured creditor's deficiency claim. However, the court in dictum for the sake of judicial economy went on to conclude that a new value exception to the absolute priority rule in 11 U.S.C. § 1129(b)(2)(B) does not exist. *Id.* at Pt. V. To the extent the *Greystone* court first found there was no exception for new value in the statutory language of the absolute priority rule in 11 U.S.C. § 1129(b)(2), this court does not disagree. However, the analysis is incomplete, and it skews the *Greystone* court's subsequent analysis by approaching the independent doctrine allowing infusions of new value as a variation from the absolute priority rule. Just as the statutory language of the absolute priority rule does not authorize an exception, the statutory language also does not reject the extrastatuto-

ry doctrine which allows infusion of new capital for reasonably equivalent future participation.

The *Greystone* court also found a "creditor control principle embodied in Chapter 11...." *Id.* This court disagrees. Under the Bankruptcy Code, the rights of creditors must be protected and creditors vote on a plan, but the debtor's presumptive control balances the negotiating positions. Further, in *Greystone* the court characterizes the write-down of the undersecured creditor's debt without allowing the creditor to take back its building as an "egregious alteration of rights without the secured creditor's consent," but this is precisely the effect of 11 U.S.C. § 506(a) and (b) as recognized in *Timbers of Inwood Forest, supra*. Finally, the *Greystone* court uses its "disagree[ment] with the assumption that the Code permits a nonconsensual plan to 'sell' the debtor to its old equity owners" to conclude, without statutory basis, that such a sale is prohibited. To the contrary, 11 U.S.C. § 1129(b) allows the cramdown of a fair and equitable plan on a dissenting creditor if the express statutory prerequisites are satisfied. It is no response to suggest, as does the *Greystone* court, that evaluation of a cramdown is complicated.

The facts in *Greystone* appear to have troubled the court. However, this court concludes the issue of the adequacy of a new value contribution by former equity holders, in exchange for future participation in a reorganized enterprise, is essentially factual. Consideration of the issue is not barred as a matter of law.

(iii)

▇ In this case, the new value offered by third parties and some former partners of the debtor for future equity ownership is $150,000 in cash. This amount on the facts of this case is not so small that the court can conclude as a matter of law that it is not reasonably equivalent to the value of the investors' future participation under a plan, if the plan gives creditors all preinvestment tangible and intangible property values of the debtor. These questions in-

volve feasibility of the plan, they are inherently factual, and they are more appropriately addressed in a confirmation hearing.

## B.

### *The Impact of Fair and Equitable on the Possibility of Distributions to New Investors.*

■ Balcor further claims that even if a new value exception to the absolute priority rule survived enactment of the Code, the proposed plan is still not confirmable because it permits payment of excess cash flow to insiders prior to paying Balcor's unsecured deficiency claim in full. Since the court views cash infusion as conceptually different in substance from an exception to absolute priority, the court concludes that investors are not prohibited as a matter of law from receiving a reasonable return from their investment prior to payment of unsecured creditors in full. See *Kansas City Terminal Ry. Co. v. Central Union Tr. Co.*, 271 U.S. at 455, 46 S.Ct. at 551. The issue is whether each holder of an unsecured claim will receive either the present value of its allowed claim or a proportionate share in its class of the value of all debtor's property, so that pre-existing interests of this insolvent debtor get nothing. 11 U.S.C. § 1129(b)(2)(B).

All property of the debtor means in kind or the present value equivalent which recognizes the priority to which creditors are entitled in a debtor's assets. If unsecured creditors have received the fair value of future participation in a reorganized debtor, it might be possible for new investors to receive excess cash flow which was not needed for that purpose. If new investors have paid the present value of future participation in money or money's worth, there is nothing inherently unfair or inequitable about them receiving the future participation they purchased. Again, the determinations are inherently factual; they involve plan feasibility and the value of property interests offered by the debtor to creditors; and they are a subject for the confirmation hearing.

## C.

### *Solicitation of Investment and Section 12(2) of the Securities Act of 1933.*

■ Balcor alleges that the solicitation of Debtor's limited partners for new investment misstated the value of the Woodscape Apartments, which skewed its projections. Consequently, it is contended that distribution of this erroneous information violated Section 12(2) of the Securities Act of 1933, which is an anti-fraud provision not covered by the exemptions in 11 U.S.C. § 1145. 15 U.S.C. § 77*l*(2) (1991). This allegation is supported by reference to *James Hopkins University v. Hutton*, 297 F.Supp. 1165 (D.Md.1968), *rev'd in part aff'd in part by* 422 F.2d 1124 (4th Cir.1970), *remanded*, 326 F.Supp. 250 (D.Md.1971), *supplemented by*, 343 F.Supp. 245 (D.Md.1972), *rev'd in part and aff'd in part by*, 488 F.2d 912 (4th Cir.1973), *cert. denied*, 416 U.S. 916, 94 S.Ct. 1623, 40 L.Ed.2d 118 (1974). In *Hutton*, the court found, *inter alia*, that Section 12(2) of the Securities Act of 1933 did not require an intentional act by the seller to establish a fraud upon buyers. *Hutton*, 297 F.Supp. at 1219. Balcor attempts to expand this reasoning by arguing that the allegedly inaccurate dispersal of information to Debtor's limited partners makes Debtor's plan patently unconfirmable. This court disagrees with Balcor in both substance and reasoning.

Section 12(2) of the Securities Act of 1933 provides that any person who—

offers or sells a security ... which includes an untrue statement or a material fact or omits to state a material fact necessary in order to make the statements, in light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise or reasonable care could not have known, of such untruth or omission, shall be liable to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less

the amount of any income received thereon[.]

15 U.S.C. § 77*l* (2) (1991).

First, Balcor has no standing to bring an action to recover property from Debtor under Section 12(2), since it is not "the person purchasing such security" from Debtor. Only buyers have a cause of action under Section 12(2). *Greater Iowa Corp. v. McLendon*, 378 F.2d 783 (8th Cir. 1967); *Bosse v. Crowell Collier & MacMillan*, 565 F.2d 602 (9th Cir.1977); *Gutter v. Merrill Lynch*, 644 F.2d 1194 (6th Cir.), *cert. denied*, 455 U.S. 909, 102 S.Ct. 1256, 71 L.Ed.2d 447 (1981). While Balcor has standing to seek relief from stay and to object to Debtor's plan, it has not identified a partner who would and could successfully sue to revoke an investment. Therefore, its argument is speculative and premature, and it does not invalidate as a matter of law the expressions of investment interest Debtor has proffered.

Second, any omission made by a seller must be examined "in light of the circumstances under which [it] was made." Balcor asserts that Debtor is unable to propose a plan reasonably in prospect because it solicited investment based on an untrue statement. However, only expressions of interest in making a new investment were solicited. The final solicitation will not be made until after the disclosure statement has been approved and the plan assumptions have been finalized. Therefore, the question is a fact specific one for the confirmation hearing, namely, whether under the circumstances the solicitation of necessary funding for the plan was sufficiently fraudulent to make the plan not feasible. Is the probability that Debtor's funding would be recovered by investors sufficiently great that the plan is likely to be followed by liquidation or further financial reorganization? 11 U.S.C. § 1129(a)(11).

Third, it is inconsistent for Balcor to claim that Debtor has made inadequate attempts to solicit cash commitments, and simultaneously, to assert Debtor cannot accurately solicit bids because there is an unknown value to the property. For these reasons, Balcor's allegations do not make Debtor's plan unconfirmable as a matter of law at this stage.

### IV. Conclusions.

This court finds that no meaningful distinction exists in the application of the absolute priority rule under a creditor based test, or a class based test as applied to Balcor. Further, there exists an opportunity for necessary new investment by partners of Debtor in exchange for participation in the plan of reorganization which is reasonably equivalent to the new contribution. The doctrine which allows for this opportunity is independent of, and does not violate, the absolute priority rule. Debtor may pay new investors a reasonable return on their investment from excess cash flow without violating the fair and equitable provisions of the Bankruptcy Code, if creditors have received all property values of Debtor existing at confirmation before the new investment is made. Issues concerning feasibility of the payments and proper classification of claims for voting purposes may be deferred for determination at a confirmation hearing. Finally, there is no incurable violation of the Securities Act of 1933 under facts stated by Balcor, and its objection on this ground is premature, speculative, and so fact specific that it cannot bar confirmation as a matter of law before the confirmation hearing.

While this court is seeing a greater number of motions for relief from stay against debtors with single real estate assets, the solution is not to make every reorganization of an insolvent debtor into a liquidation by denying equity holders the right of participation. Since few plans of reorganization in today's depressed real estate market could pay unsecured creditors 100% of their claims, refusing to permit equity holders an opportunity to invest destroys any incentive which might exist for capital contribution. Without fresh capital infusion, little hope exists for reorganizing deflated assets in a bad market. Such a result would violate a policy of the Bankruptcy Code to promote reorganization over liquidation where reorganization will preserve on-going business values and materially in-

crease distributions to creditors, while adequately protecting the rights of senior secured creditors. Consequently, the motions for relief from stay will be denied.